**NRG COMPANY, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 671–86L and 672–86L**

United States Claims Court.

Aug. 28, 1991.

Sidney R. Thomas, with whom were Thomas E. Ebzery and William H. Bellingham, Billings, Mont., for plaintiffs.

Thornton Withers Field, Washington, D.C., for defendant.

## OPINION

ANDEWELT, Judge.

In these consolidated actions, plaintiffs, NRG Company, Mike T. Gustafson, William Lang, Bellford & Co., Cormorant Corp., Wesco Resources, Inc., and Thermal Energy, Inc., seek damages resulting from the alleged cancellation by the United States of three mineral prospecting permits that authorized the permittees to explore for coal on the Northern Cheyenne Indian Reservation in Montana. In their respective complaints, plaintiffs allege three distinct theo-

ries for government liability. These cases are presently before the court on cross-motions for summary judgment on one of those theories—that the government's cancellation of the permits pursuant to legislation enacted in 1980 violated the fifth amendment's prohibition against taking of private property for public use without just compensation. The grant of summary judgment is appropriate if there are no material issues of fact in dispute and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). For the reasons set forth below, there are no material issues of fact in dispute and the court agrees that the cancellation of the permits constitutes a taking of plaintiffs' property. Therefore, plaintiffs' motion for summary judgment on the issue of liability for a permanent taking is granted,[1] and defendant's cross-motion is denied.

## I.

During the late 1960s, in an effort to encourage economic development, the Northern Cheyenne Tribe (the Tribe) adopted a series of resolutions authorizing the Department of the Interior's Bureau of Indian Affairs (BIA) to sell coal prospecting permits on Cheyenne reservation land. The three permits in issue in this litigation resulted from a January 22, 1971, BIA notice of competitive sale. The permits were issued with the approval of the BIA on June 14 and 15, 1971.[2] Plaintiffs are the present or former owners of the permits.

The permits, each entitled "Mineral Prospecting Permit (Exclusive with Option)," granted the permittees two pertinent rights. First, the permittees received an exclusive right to prospect for coal on specified portions of the Tribe's reservation. Each permit granted this "exclusive right

for a period of 2 years, with the right to a single 2–year renewal ... from the date of approval of this permit by the Secretary of the Interior." Second, the permits effectively granted the permittees the option to obtain a lease on at least a portion of the land covered under the permits. Each permit provided, in pertinent part: "Permittee may at any time during the term of this permit, obtain a lease on any of the land embraced in this permit. [With specified exceptions], a lease shall not exceed 2,560 acres.... This right, if exercised, shall be by written application from Permittee...."[3] The January 22, 1971, notice of sale specified the term of a lease and the royalty rate for extraction of coal under such a lease.

On March 5, 1973, the Northern Cheyenne Tribal Council passed a resolution requesting the BIA and the Secretary to withdraw approval of the three permits in issue, as well as all other coal prospecting permits, and to terminate and cancel them. The resolution stated: "[The] Tribe does not recognize the existing permits and leases as binding on the ... Tribe due to the failure of the [BIA] to comply with [applicable BIA regulations]." The BIA did not take any pertinent immediate action in response.

On June 5, 1973, less than two years after entering the permits in issue, the permit holders made timely applications for a two-year renewal. Early in 1974, Chevron Oil Company, which also had a coal prospecting permit, requested clarification of the BIA's position both as to the validity of the permits and leases and as to whether the two-year permits and renewal periods would continue to run during the pendency of the Secretary's consideration of the Tribe's objections. The Area Director of the BIA responded that (1) absent a contrary decision by the Department of the

---

1. Plaintiffs also seek summary judgment on a theory that a temporary taking occurred prior to the permanent taking. That issue requires additional argument and will not be resolved herein.

2. Before a lease authorizing mineral mining on an Indian reservation can be granted, both the

Indian tribe and the Secretary must approve. 25 U.S.C. § 396a (1983).

3. In addition, each permit provided that "[w]hile the permitted premises are in trust or restricted status, all Permittee's obligations under this permit ... are to the United States as well as to [the Tribe]."

Interior, the BIA regarded all leases and permits as valid, and (2) for all permits and leases ultimately found to be valid, the BIA viewed the permit time periods as suspended during the pendency of the Secretary's consideration of the Tribe's objections. As to this suspension, the Area Director explained:

There is no specific provision in the [BIA's] regulations providing for suspension of permits during pendency of an administrative action considering the validity of those permits or leases as the case may be. The passage of [the Tribe's resolution] dated March 5, 1973, was a demand by this tribe that regular business activity cease insofar as it concerns ongoing activity with coal permits and leases now in force between the tribe and several energy companies including Chevron Oil Company. To the fullest extent possible the Bureau patterns its activities in accordance with Indian wishes.

Since Chevron's operations together with those of the other companies in a comparable position were interrupted by the March 5, 1973, resolution from the tribe and since the interruption was beyond any control of Chevron and the others, we think that the period of time between the date of the resolution and the date upon which the permits and leases now in force are declared to be valid, if this be the case, will be suspended from the running of the term of any permit or lease. If they are declared to be invalid these considerations will, of course, be academic. We believe that the suspension of the running of the term of these contracts under these circumstances would be upheld by any Court pursuant to basic contract law the silence of our regulations on such suspension notwithstanding.

On January 4, 1974, the Tribe formally petitioned the Secretary, as trustee for the Tribe, to void the three permits in issue

here. The Tribe claimed that the permits exceeded allowable acreage limits, that there had been improper, speculative and/or collusive bidding, that the required technical examination had not been conducted, that the bond posted was inadequate, that the permits had been unlawfully assigned, and that the permits were in violation of the Tribal Charter and the National Environmental Protection Act.

In a June 4, 1974, decision, the Secretary responded to the Tribe's petition that the permits be voided and to the permit holders' pending requests for renewals and/or leases. First, the Secretary refused to void the permits. He referred the Tribe's allegations concerning speculative bidding and unlawful assignment to the Office of Hearings and Appeals and the Tribe's allegations of failure to secure the required technical environmental examination to the BIA Area Director.[4] The Secretary denied all other requests in the petition, including the allegation of collusive bidding. Second, as to the permit holders' requests for renewals and/or leases, the Secretary concluded that "any further action by the Department, including permit renewals, will be held in abeyance until completion of an Environmental Impact Statement." The Secretary further stated that "the Tribe and the coal companies may be assured that the terms and conditions upon which mineral development may proceed on the Northern Cheyenne Reservation will require their joint agreement and support prior to any further approval by [the Secretary]."

In a March 4, 1975, letter to the Tribe, plaintiff NRG Company (NRG) sought permission to continue exploration under its two permits. NRG explained that it had been advised by an unnamed source that the Tribe did not intend to allow such further exploration. Commenting on that letter, the BIA Area Director indicated that "pursuant to [the Secretary's June 4, 1974] decision, the permits are in suspension and

---

4. On July 23, 1974, the BIA issued a report to the Secretary which indicated that the technical assessments were essentially satisfactory and that any other environmental concerns should be worked out through negotiation of the leases.

On October 4, 1974, due to a dispute over discovery procedures, the Tribe withdrew its objections as to speculative bidding and unlawful assignment from consideration by the Office of Hearings and Appeals.

we cannot authorize any action under them."

On June 11, 1975, less than four years after the permits in issue were entered, NRG requested in writing that the BIA issue mining leases under each of the three permits. NRG complained that the Tribe had denied it permission to enter the reservation and complete the exploratory work. In a June 27, 1975, response, the BIA indicated that "Environmental Impact statements and further negotiations with the tribe will need to be completed prior to eventual approval of a coal lease or leases." The BIA observed, however, that NRG's application was timely and "will be held without action for the time being." On July 3, 1975, the BIA acknowledged receipt of a written report from NRG on the prospecting activities that had been performed under the three permits, and the BIA referred the report to its Branch of Realty to check for conformity with the permit requirements.

## II.

As indicated above, the Tribe had similar disputes with other permit and lease holders. These disputes became the focus of congressional concern and Congress ultimately enacted the Act of October 9, 1980, Pub.L. No. 96–401, 94 Stat. 1701 (1980) (the Cancellation Act or the Act). The Act specified the permits and leases it covered, including the three permits in issue here. Section 1 of the Act articulated a series of factual findings, including:

(3) although [the] leases and permits were approved by representatives of the Secretary of the Interior, there are serious questions whether such approval is lawful and consistent with the trust responsibility of the Secretary of the Interior to "act in the best interests" of Indian tribes and individuals;

(4) the present impasse with regard to such leases and permits, unless resolved, can only result in expensive and time-consuming litigation that does not hold out the likelihood of a satisfactory solution that would be fair to all parties; and

(5) cancellation of such leases and permits, and providing a fair remedy to any party or parties whose property interest, invested in good faith, would be adversely affected by such cancellation, appears to be the most direct and effective manner within which to resolve this impasse.

The Act effected cancellation of the permits and leases in either of two ways. First, the Tribe, the permit holders, and the Secretary were given until January 1, 1982, to negotiate a cancellation agreement. In exchange for the permit holder's agreement to cancel the permits, the Act authorized the Secretary to offer the permit holders noncompetitive coal leases on federally owned coal deposits and/or certificates of bidding rights that would have a cash value at subsequent competitive federal coal lease sales.

Second, if the parties were unable to reach a cancellation agreement by January 1, 1982, the Act provided that the permits would be cancelled by operation of law and "the United States Court of Claims shall have jurisdiction to render judgment on any claim against the United States arising out of such cancellation." The Act further stated that "nothing in this Act shall establish or extinguish any claim or liability that may arise in connection with such ... permit, or right to a lease so canceled."

The Department of the Interior reached tentative cancellation agreements for all permits covered by the Act. Prior to the January 1, 1982, deadline, the Tribe approved each of the agreements except for those relating to the three permits here in issue. In a January 30, 1982, letter, the Department of the Interior's Bureau of Land Management informed the Tribe that because the Tribe had not signed the cancellation agreements by the January 1, 1982, deadline, the three permits "were cancelled by operation of law on that date and any compensation for the cancellation must be sought by the ... permittees from the U.S. Court of Claims." The Department of the Interior took the same position in an April 30, 1982, report to Congress, in which it stated that the three permits "were cancelled by [the Act] on January 1,

1982, and the parties will have to seek compensation for the cancellation in the U.S. Court of Claims."

Prior to January 1, 1982, plaintiffs had made payments to the BIA as required under the permits. As of March 10, 1982, amounts in excess of $227,000 were held in BIA escrow accounts. On October 23, 1986, plaintiffs filed the instant consolidated actions. In their respective complaints, plaintiffs contend that the cancellation of the permits: (1) deprived plaintiffs of property in violation of the fifth amendment; (2) violated Article I, Section 8, of the Constitution as being beyond constitutional authority; and (3) constituted a breach of contract with plaintiffs. In the instant cross-motions for summary judgment, each party seeks judgment with respect to defendant's fifth amendment liability.[5] Defendant contends, in effect, that no fifth amendment taking occurred because the permits expired prior to enactment of the Cancellation Act and, in any event, even if they were cancelled by the Cancellation Act, the cancellation did not amount to a taking of private property compensable under the fifth amendment.

### III.

As explained above, prior to this litigation the BIA consistently took the position that (1) the pertinent renewal and lease requests were timely filed, (2) the permits and the requested leases were held "in abeyance" and "in suspension" by the BIA pending resolution of the Tribe's objections, and (3) the permits were cancelled on January 1, 1982, pursuant to the Cancellation Act. However, in its cross-motion for summary judgment, defendant takes a contrary position to the effect that the Act had no impact at all on the permits because the permits had expired by their own terms prior to January 1, 1982. Defendant argues, in effect, that the permits ran for two years from the date of issuance with a right to a single two-year renewal. Defendant contends that the Department of the Interior lacked authority to toll these time periods and, therefore, the permits expired no later than four years after their issuance, or by June 16, 1975. Defendant's arguments toward this result are not persuasive for two reasons. First, the Secretary of the Interior apparently did possess the requisite authority to suspend the permits. Second, in any event, even if the Secretary lacked such authority, the permit holders maintained the right to obtain a lease until the permits were cancelled pursuant to the Cancellation Act.

### A.

■ As noted above, the approval of an Indian tribe is a prerequisite to the grant of any rights to mine Indian reservation land.[6] However, once an Indian tribe makes the decision to authorize mining on its reservation land, the Secretary of the Interior, as trustee for the Indians, has broad authority over the leasing process. 25 U.S.C. § 396 provides, in pertinent part:

All lands allotted to Indians ... may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior; and the Secretary of the Interior is authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect.

The resulting regulations, which were incorporated into the permits, grant the Secretary extensive powers. For example, the

---

**5.** Defendant also sought dismissal of these actions because Wesco Resources, Inc. (Wesco), and Thermal Energy, Inc. (Thermal), were not originally named as plaintiffs but were real parties in interest. However, Wesco and Thermal were joined as plaintiffs on June 12, 1990.

**6.** 25 U.S.C. § 396(a) provides:
   On and after May 11, 1938, unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under

Federal jurisdiction ... may, with the approval of the Secretary of the Interior, be leased for mining purposes, *by authority of the tribal council or other authorized spokesmen for such Indians....*
(Emphasis added). The regulations implementing Section 396(a) provide: "Indian tribes, bands or groups may, with the approval of the Secretary of the Interior ... lease their land for mining purposes." 25 C.F.R. § 171.2 (1974).

Secretary has the authority to approve permit assignment without tribal consent (25 C.F.R. § 171.26 (1974)), to inspect permit holders' operations, books, and records (Section 171.18), and to deny permission for development and mining operations on lease land (Section 171.20). The Secretary also has the exclusive authority to cancel permits (Section 171.27). While there is no regulation specifically authorizing the Secretary to suspend permits when deciding whether to cancel them, Section 1.2 provides the Secretary with broad discretion to depart from the limits of the regulations in order to promote Indian interests. Section 1.2 states, in pertinent part: "Notwithstanding any limitations contained in the regulations of this Chapter, the Secretary retains the power to waive or make exceptions to his regulations ... in all cases where permitted by law and the Secretary finds that such waiver or exception is in the best interest of the Indians."

Here, it cannot be disputed that in suspending the permits the Secretary sought to act in the best interest of the Cheyenne Tribe. The Tribe objected to the permits, alleged they were void, and requested that the Secretary exercise his exclusive authority to cancel them. The Secretary's decision to suspend the running of the permits benefitted the Tribe by halting further development of the land. It gave the Secretary an opportunity to complete his evaluation before he issued either a renewal of the permits or a mining lease. At least in a situation such as is apparently the case here, where the permit holders and the Tribe effectively acquiesced to such a suspension pending final resolution of disputed issues, the Secretary would appear to have the requisite authority to suspend the permits.

### B.

■ In any event, even if the Secretary lacked authority to suspend the permits, the permit agreements remained in effect and plaintiffs had a present right to receive a lease at the time the Cancellation Act was enacted. As described above, each permit has two pertinent provisions. First, each provides that the "Permittee may re-new this permit on all or part of the acreage for a period of 2 years by written application." Here, the permit holders made such a timely request for a renewal. Second, each permit provides that the "Permittee may at any time during the term of this permit, obtain a lease on any of the land embraced in this permit" and that "[t]his right, if exercised, shall be by written application from Permittee." As explained above, as the title of the permits indicates ("Mineral Prospecting Permit (Exclusive with Option)"), this second provision grants the permittee an option to secure a lease. Here, the permit holders exercised this option by making the required written request for a lease within the guaranteed two-year renewal period.

Having satisfied these pertinent permit requirements, and assuming they satisfied all other pertinent permit provisions (*See* Section IV, *infra*), the permit holders had a present right to receive a mining lease. Nothing in the permit agreements limited or extinguished that right. The permits do not indicate that if the BIA delays in issuing a written acknowledgement of permit renewal or in issuing a written lease, the governmental and tribal obligations are cancelled. Thus, under the terms of the permits, the permit holders' right to receive a lease remained unextinguished up through the enactment of the Cancellation Act.

■ Defendant takes the position that a timely filed written application for a lease is not sufficient and that additional tribal consent is required before a permit holder would be entitled to receive a mining lease. But while tribal approval is clearly necessary for a lease of Indian land, as explained above, the title and wording of the permits in issue here make clear that the permit holders received an option to obtain a lease. In view of this option, the Cheyenne Tribe must be deemed to have given its approval for the ultimate grant of a lease at the time it signed the permits.

*Wilson v. United States Dept. of Interior,* 799 F.2d 591 (9th Cir.1986), upon which defendant relies, does not suggest a differ-

ent result. The original wording of the *Wilson* permit was essentially the same as the wording of the instant permits.[7] However, following the decision in *Davis v. Morton*, 469 F.2d 593 (10th Cir.1972), which required the Secretary to consider the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, before approving a lease of Indian lands, the parties revised the permit to provide, as follows:

> a. PRIVILEGE TO APPLY FOR LEASE—Permittee shall have the exclusive privilege during the term of this permit to apply to the Permitter for a lease or leases on any of the land embraced in this permit.

*Wilson v. United States Dep't of Interior*, No. R–83–350 BRT, slip op. at 3 (D.Nev. Aug. 12, 1985) (emphasis omitted).

The district court concluded that the change in the wording merely gave the Secretary limited discretion to reject a lease because of environmental concerns and did not otherwise modify the permittee's option to secure a lease by making a written application. *Wilson*, slip op. at 7. The Court of Appeals for the Ninth Circuit reversed. The court noted that "[t]he permit gave [the permittee] an 'exclusive privilege' *to apply* to the Tribe for mineral leases on Reservation land any time during the term of the permit." *Wilson*, 799 F.2d at 591 (emphasis added). The court then concluded that because "[o]nly the Tribe has authority to lease its lands," *id.* at 592, and because the Tribe had subsequently resolved not to enter into any lease, the suit must be dismissed as moot because the Tribe had not been joined as a party and the court could not grant any effective relief. *Id.* But the instant permits grant the permit holders the right to "obtain a lease" not merely an "exclusive privilege ... *to apply*" for a lease. Hence, unlike in *Wilson*, the Tribe herein committed itself in the permit to grant a lease upon written request.

One other point is worth emphasizing on the issue of whether the permits in issue should be interpreted as requiring a second tribal approval at the time the permittees request a lease. The permit agreements envision a two-step process—a permit stage and a lease stage. During the permit stage, the permittee expends its own funds in exploring for coal. If the permittee is fortunate enough to discover commercially viable deposits of coal, it can proceed to the second stage and secure a lease, under which the permittee can remove coal from the leased land at a previously established royalty rate. Hence, the lease stage offers the permittee the potential to profit from the investments it made during the permit stage. If the permits were interpreted to allow the Tribe to reconsider its intention to allow a lease at the time the permittee requested a lease, the permittee would have no reasonable assurance that it could ever profit from the substantial investments made during the permit stage. Indeed, the Tribe potentially could refuse to enter a lease with the discoverer of the coal and then seek to sell the coal to another party who did not make the discovery. Hence, the interpretation that no tribal approval is necessary at the lease stage not only is required by the plain wording of the permits, but also produces an economically rational agreement that reasonably could have been intended by the parties.

## IV.

■ Defendant presents an alternative argument that plaintiffs had no right to obtain a lease because plaintiffs had failed to satisfy the diligence and development requirements of the permits. Each permit required the permittees to spend at least $1 per acre during both the primary and renewal terms of the permit and to submit annual statements detailing such expenditures. Defendant argues that plaintiffs

---

**7.** The original prospecting permit in *Wilson* provided, in pertinent part:

> 2.a. PREFERENCE—Permittee may at any time during the term of this permit, obtain a lease or leases on any of the land embraced in this permit.... This right, if exercised, shall

be by written application from Permittee addressed to the Superintendent, describing the particular land desired.

*Wilson v. United States Dep't of Interior*, No. R–83–350 BRT, slip op. at 3 (D.Nev. Aug. 12, 1985).

failed to make these payments and file the related reports during the renewal period, allegedly because the Tribe would not allow plaintiffs on the permit land.

Each permit states, in pertinent part:

Failure by the Permittee in the diligent development and continued prospecting and exploration work, except when operations may be interrupted by strikes, the elements, or casualties not attributable to the Permittee, shall be a want of compliance with the terms of this permit and shall render it subject to cancellation.

But the permits cannot reasonably be interpreted to provide sanctions for nondiligence where, as apparently was the case here, any failure to comply with permit requirements was attributable to the Tribe rather than to the permittees. More fundamentally, however, even if this failure to comply were attributable to the permittees, the permits do not provide that such a failure to comply renders the permits void or otherwise terminates the permittees' right to obtain a lease. Rather, the permits simply provide that the permits become "subject to cancellation." Under the terms of the permits, cancellation is a remedy exclusively within the authority of the Secretary and a decision on cancellation is to be based on "opinion[s]" formed by the Secretary. Before making a cancellation decision, the Secretary, *inter alia,* must provide notice of the terms and conditions allegedly violated, provide an opportunity for a hearing, and provide an opportunity for the permittee to cure any default.[8]

Here, the Secretary chose not to institute such a cancellation procedure but instead allowed the permits to be cancelled by the Cancellation Act. In this context, plaintiffs had an existing right to obtain a lease when the Cancellation Act was enacted. That right, as well as all other rights and safeguards contained in the permits, was terminated by defendant pursuant to the Cancellation Act. It simply is too late now for defendant to raise an issue with respect to plaintiffs' alleged failure to satisfy the diligence and development requirements of the permits. The permit envisions that issue being raised by the Secretary in a cancellation proceeding occurring during the term of the permits.[9]

Indeed, in enacting the Cancellation Act, Congress apparently intended to avoid litigation on precisely such issues. As detailed above, in the findings listed in the Act, Congress explained that there was an existing "impasse" with regard to the permits which "unless resolved, can only result in expensive and time-consuming litigation that does not hold out the likelihood of a satisfactory solution that would be fair to all parties." Congress concluded that "the most direct and effective manner within which to resolve this impasse" was to cancel the leases and "provid[e] a fair remedy to any party ... whose property interest ... would be adversely affected by such cancellation." Defendant's proposal to the effect that the court inquire into the Secretary's decision not to seek cancellation would likely produce the very type of expensive and time-consuming litigation Con-

---

**8.** Paragraph 2(s) of the permits provides, in pertinent part:

(s) *CANCELLATION AND FORFEITURE.* When, in the opinion of the Secretary of the Interior or his authorized representative, there has been a violation of any of the terms or conditions of this permit before restrictions are removed, the Secretary of the Interior or his authorized representative has the right at any time after 30 days' notice to the Permittee specifying the terms and conditions violated and after a hearing if the Permittee shall so request within 30 days of receipt of notice, to declare this permit void, and the Permitter may then take immediate possession of the lands; *Provided,* Permittee does not cure its default within said 30 days or, if Permittee requests a hearing and does not

cure its default within 20 days after the final decision resulting from said hearing.

**9.** Defendant also originally contended that plaintiffs were not entitled to a lease because the permits had been secured through collusive bidding and had been unlawfully assigned. Defendant abandoned these contentions at oral argument. Defendant explained, in pertinent part: "On collusive bidding, the proper forum would have a cancellation procedure before the Department of Interior and we do not believe this is the proper forum for addressing that issue." This same rationale applies equally to defendant's claim based on an alleged failure to comply with the diligence and development requirements set forth in the permits.

gress apparently sought to avoid when it enacted the Cancellation Act.

## V.

█ Next, defendant contends that even if the permits were cancelled by the Cancellation Act, such cancellation did not amount to a compensable taking of private property under the fifth amendment. The appropriate standard for evaluating such a takings claim was summarized in *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). In *Connolly*, the Court stated:

> In all of these cases, we have eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case. *[Ruckelshaus v.] Monsanto Co.*, 467 U.S. [986], 1005 [104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984)]; *Kaiser Aetna [v. United States*, 444 U.S. 164,] 175 [100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)]. To aid in this determination, however, we have identified three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Central Transportation Co. [v. New York City*, 438 U.S. 104,] 124 [98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)]. *Accord Monsanto Co., supra* [467 U.S.], at 1005 [104 S.Ct. at 2874]; *Prune Yard Shopping Center v. Robins*, 447 U.S. 74, 82–83 [100 S.Ct. 2035, 2041–42, 64 L.Ed.2d 741] (1980).

475 U.S. at 224–25, 106 S.Ct. at 1026.

In contending that there was no taking, defendant relies in part upon the Claims Court decision in *United Nuclear Corp. v. United States*, 17 Cl.Ct. 768 (1989). But subsequent to briefing and oral argument, that decision was reversed on appeal. 912 F.2d 1432 (Fed.Cir.1990).

*United Nuclear* similarly involved a mineral lease (uranium) for mining on Indian reservation land. Under the terms of the lease, prior to commencing commercial mining, the lessee was obliged to secure approval of a mining plan. After the lease was entered, the Department of the Interior adopted a policy pursuant to which it would not approve the lessee's proposed mining plan unless the lessor, the Navajo Tribe, approved the plan. When the Navajo Tribe refused to approve the plan, the lessee brought a takings claim against the United States.

In evaluating this claim, the Claims Court focused on the three factors set forth in *Connolly*. The court acknowledged that the government's failure to approve the mining lease caused severe economic hardship to the lessee. However, the court found no taking based on the second and third *Connolly* factors as those factors were applied in the Federal Circuit's decision in *Allied–General Nuclear Services v. United States*, 839 F.2d 1572 (Fed.Cir.1988). In pertinent part, the Claims Court rejected the lessee's contention that it had a reasonable investment-backed expectation that its mining plan would be approved. The court stated:

> It was not a reasonable investment-backed expectation that merely achieving technical adequacy of the mine plan under the regulations automatically *required* Secretarial approval of [United Nuclear's] mine plan ministerially. A sophisticated company like [United Nuclear], schooled in the vicissitudes of Government, should have reasonably contemplated the possibility of Government inaction and delay.
>
> The Court believes it was reasonable for [United Nuclear] in dealing with the Navajos and the Government, to assume that there would be tribal involvement in the mine plan decision-making process when weighed against the trust responsibilities of the Secretary created by the Indian Mineral Leasing Act of 1938 (25 U.S.C. §§ 396a–396f) and the Government's policy of Indian Self–Determination which had its origins in a policy statement by President Nixon in 1970 which, in turn, culminated in the enactment of the Indian Self–Determination

and Education Assistance Act, 25 U.S.C. §§ 450, *et seq.*, some 2 years before [United Nuclear] submitted its mine plan to [the United States Geological Survey] for approval.

*United Nuclear*, 17 Cl.Ct. at 776. (emphasis in original)

On appeal, the Federal Circuit reversed. The Federal Circuit viewed the lessee's reasonable expectations quite differently and stated:

United [Nuclear] invested more than $5 million in the project and presumably expected to derive substantial profits from the venture. Prior to the April 1978 meeting with Departmental officials, United [Nuclear] had no indication or even suggestion that tribal approval of the mining plan would be required before the Secretary would approve it. Indeed, previously tribal approval of mining plans had not been required. [United Nuclear's] mining plan concededly satisfied the requirements of the applicable regulations. Prior to the meeting, United justifiably believed and expected that if its mining plan met the requirements, the Secretary would approve it—as he had done for [United Nuclear's] exploration plan.

\*     \*     \*     \*     \*     \*

The Secretary's new requirement of tribal approval of the mining plan was not adopted or included in any regulation of the Secretary. If the Secretary had proposed such a regulation, United would have had the opportunity to oppose it. Indeed, at one point, the Secretary had proposed (although never adopted) a regulation, applicable only to future and not to existing leases, Proposed § 177.2(c), that required only that the "Mining Supervisor shall be available to consult with the Indian mineral owner before acting to approve or disapprove any such plan," Proposed § 177.5, and not that the plan be approved by the tribe. Dep't of Interior, *Mining on Indian Lands, Proposed Rules*, 42 Fed.Reg. 18,083, 18,088–89 (Apr. 5, 1977).

The fact that United [Nuclear] agreed that the leases would be subject to future regulations does not indicate that United fairly can be said to have anticipated that the Secretary would apply a new policy requiring tribal approval of mining plans to leases entered into almost six years earlier, in reliance on which United [Nuclear] had expended some $5 million.

*United Nuclear*, 912 F.2d at 1436.

In discussing the third *Connolly* factor—the character of the governmental action—the Federal Circuit distinguished its prior decision in *Allied General* in which it had found no taking where the government refused to issue a final operating license to a nuclear power reprocessing plant. The Federal Circuit concluded that *Allied General* involved issues of national security and had applied "the basic rule ... that as against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public." *Id.* at 1437, quoting *Allied–General*, 839 F.2d at 1576. The court concluded that no such national safety concerns were raised by United Nuclear's proposed mining plan.

## VI.

When the three-factor test of *Connolly* is applied to the instant facts, the necessary conclusion is that a federal taking of private property occurred.

### Economic Impact

The first *Connolly* factor—the economic impact—certainly supports such a conclusion. As in *United Nuclear*, plaintiffs herein had invested substantial sums and suffered significant economic hardship from the cancellation of the permits.

### Interference With Distinct Investment– Backed Expectations

With respect to the second *Connolly* factor—reasonable investment-backed expectations—the instant facts differ from *United Nuclear* in part in that *United Nuclear* involved a lease and the instant case involves only permits. But this distinction is not material. Just as the lessee in *United Nuclear* had a reasonable invest-

ment-backed expectation that its mining plan would be approved, thereby rendering the lease valuable, plaintiffs here had a reasonable investment-backed expectation that the option to obtain a lease would be honored, thereby rendering the permits valuable. Here, as in *United Nuclear*, the government chose to modify the established rules after the pertinent agreements were entered. It certainly was not reasonably foreseeable at the time the instant permits were signed that the government would enact legislation cancelling them.

Defendant contends, in effect, that the government's action could not be said to interfere with plaintiffs' reasonable investment-backed expectations because the Cheyenne Tribe had repudiated the permits and the Tribe successfully could have claimed sovereign immunity from any suit under the agreements. *See, e.g., Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512–13, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940). But the majority opinion in *United Nuclear*, in effect, rejected an analogous sovereign immunity-based defense even though the Navajo Tribe therein had already asserted sovereign immunity in a suit brought against it in federal court. The dissent in *United Nuclear* concluded that the pertinent dispute was between the Navajos and United Nuclear, with the government at most "facilitat[ing] the Navajo's exercise of inherent sovereign immunity [over the leased land]." 912 F.2d at 1439. The dissent argued that given the Navajo's power over its own land, there could be no federal taking because there was "no evidence that 'but for' the Secretary's deference to the Tribe, mining would have proceeded." However, as explained above, the majority rejected this argument and took a very different view of the reasonable expectations of owners of mining leases on Indian land.

In addition, herein, unlike in *United Nuclear*, there is no reason to presume that the Cheyenne Tribe would have involved sovereign immunity in an effort to avoid obligations to which the Tribe willingly consented in a formal agreement. Prior to the January 1, 1982, permit cancellation date, the Cheyenne Tribe never presented a sovereign immunity defense and never stated that it intended to do so or that it would seek to avoid any otherwise binding contractual obligation. Rather, the Tribe, in effect, merely took the position that it had a defense on the merits as to the enforceability of the permits, *i.e.*, that the permits were void and should be cancelled because (1) the Secretary should have never issued them in the first place, and (2) the permit holders had not complied with the permit terms.[10] In an October 4, 1974, letter to the Secretary, the Tribe sought termination of the Office of Hearings and Appeals proceedings initiated pursuant to the Secretary's June 4, 1974, decision. The Tribe claimed there were "legal inadequacies inherent in the process [the Secretary] proposed for Secretarial decision-making" and indicated that it would "continue to assert these claims of illegality as to the permit and lease transactions in any and all suitable and appropriate forums." However, the Tribe did not indicate that it would assert a sovereign immunity defense in any forum or that it would fail to live up to its permit obligations in the event the permits were held to be enforceable.[11]

---

**10.** In its March 5, 1973, resolution, the Tribe indicated that it did not "recognize the existing permits ... as binding on [it] *due to the failure of the [BIA] to comply with 25 C.F.R. 177*" (emphasis added). The Tribe directed the BIA and the Secretary to "withdraw the department's approval and terminate and cancel all existing Coal Permits and Leases." In its January 9, 1974, petition to the Secretary, the Tribe requested that the Secretary set aside as void all of the coal permits and leases. In addition to listing ways that the BIA had allegedly violated its obligations under the regulations, the Tribe listed alleged violations by the permit holders of the terms and conditions of the permits.

**11.** Indeed, had the Tribe intended to assert tribal immunity, it apparently could have so stated and refused to allow any coal development on its reservation land. The Tribe would not have needed to go through the procedures outlined in the permits for seeking cancellation by the Secretary.

Moreover, making tribal sovereign immunity a defense to the instant taking action would seem inconsistent with the clear intent expressed by Congress when enacting the Cancellation Act. Congress specifically mentioned the availability of the Claims Court as a forum for relief and stressed its intent to provide "a fair remedy to any party whose property interest, invested in good faith, would be adversely affected by [the] cancellation." But the Cheyenne Tribe sought to have each and every permit covered by the Act cancelled. If tribal sovereign immunity were a defense to the instant takings action, it arguably could serve as a defense to all takings actions by permit holders whose permits were cancelled by the Act. Under such an interpretation, the Act would provide no remedy at all for permit holders, much less a "fair remedy."

Hence, here, as in *United Nuclear,* plaintiffs had a reasonable expectation that they would be able to mine the land under a lease. The act that prevented the instant plaintiffs from receiving the reasonably expected economic benefits of their agreement with the Tribe was an act by the government—the government's cancellation of the permits.

*Character of the Governmental Action*

Turning to the third *Connolly* factor—the character of the governmental action—as in *United Nuclear,* no issues of national safety are involved in the instant action. Nevertheless, defendant contends that the character of the governmental action dictates against a finding of a taking. Defendant argues that in enacting the Cancellation Act, Congress was merely acting either as an arbiter between the permittees and the Cheyenne Tribe or as a trustee for the Tribe and therefore was not engaging in a sovereign act subject to fifth amendment restrictions.

But defendant cannot escape the fundamental requirements of the fifth amendment through such facile characterizations.

First, Congress clearly was not acting in a traditional arbiter's role when it enacted the Cancellation Act. Rather than simply compromising the interests of the parties, the United States chose itself to pay significant costs associated with securing voluntary cancellation agreements. (The government offered the permit holders noncompetitive federal coal leases or certificates having a cash value in future federal coal lease sales.) More fundamentally, however, even assuming the Cancellation Act were interpreted as equivalent to binding arbitration, this would not make the government action immune from fifth amendment scrutiny. As stressed in *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237, 242 (1983), *aff'd,* 765 F.2d 159 (Fed.Cir.1985), *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985), "[e]ven when government is serving as an arbiter between conflicting rights, its action can amount to a taking if it frustrates 'distinct investment-backed expectations' of the property owner. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659."

Defendant's characterization of the Cancellation Act as the action of a trustee is probably closer to the mark. Congress had a trust relationship with the Cheyenne Tribe and Congress's decision to cancel the permits was apparently based on the Tribe's concerns. But the fifth amendment's restrictions on the actions of the federal government are absolute and proscribe all uncompensated takings of property for public use. The Cheyenne Indians residing on their reservation are citizens of the United States and a taking of property for their use clearly is a taking "for public use." As the Federal Circuit's finding of a taking in *United Nuclear* clearly demonstrates, Congress can no more make an uncompensated taking of private property for the benefit of trustee Indians than it can for the benefit of any other members of the public. *See also, Capurro v. United States,* 2 Cl.Ct. 722, 726 (1983).[12]

12. Defendant bases its argument that the actions of a trustee are not subject to the fifth amendment on a misinterpretation of *Three Affiliated Tribes of Fort Berthold Reservation v. United*

*States,* 182 Ct.Cl. 543 (1968). Therein, pursuant to an act of Congress, the United States sold part of the Three Tribes' reservation and attributed the proceeds to the Tribes. The Tribes, how-

### Conclusion

For the reasons set forth above, plaintiffs' motion for summary judgment on the issue of liability for a permanent taking is granted, and defendant's cross-motion is denied.

On or before September 27, 1991, the parties shall file a status report, jointly or separately, proposing further scheduling.

IT IS SO ORDERED.

ever, were dissatisfied with the amount of the payments and brought suit alleging a fifth amendment taking. In the course of analyzing how to evaluate the government's actions with respect to the Indian lands, the Court of Claims stated:

> It is obvious that Congress cannot simultaneously (1) act as trustee for the benefit of the Indians, exercising its plenary powers over the Indians and their property, as it thinks is in their best interest, and (2) exercise its sovereign power of eminent domain, taking the Indians' property within the meaning of the Fifth Amendment to the Constitution. In any given situation in which Congress has acted with regard to Indian people, it must have acted either in one capacity or the other. Congress can own two hats, but it cannot wear them both at the same time.

*Id.* at 553.

Based on this statement, defendant contends that if Congress was acting in its trustee capacity when it cancelled the permits in issue here, it could not also be engaging in a taking of plaintiffs' property. But in making this statement, the Court of Claims was merely attempting to reconcile a series of cases dealing with government disposal of Indian property. Some of these cases indicated that the appropriate route for the Indians to attack the government's disposition of their property was through a breach of trust suit before the Indian Claims Commission. Other cases permitted the Indians to bring a takings claim in the Claims Court. In the above quotation, the Court of Claims was simply explaining that when the United States was acting as a trustee when it disposed of the property, the available remedy was a breach of trust suit before the Indian Claims Commission and not a fifth amendment takings suit. The court went on to explain that the government should be deemed to be acting as a trustee when it had made a good faith effort to give the Indians the full value of their property. Hence, *Three Tribes* concerned only situations where the government had a trust relationship with the entity whose property was disposed of by the government and dealt only with the type of suit that such an entity should bring to attack the government's actions. The decision did not relate in any way to the remedies available under the fifth amendment to property owners who are not in a trust relationship with the government and whose property is taken by the United States for the benefit of an Indian tribe.