**MITCHELL ARMS, INC., A California Corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–3864 C.

United States Claims Court.

April 13, 1992.

Alvin S. Kaufer, Los Angeles, Cal., attorney of record for plaintiff. John Ossiff, of counsel.

Lois B. Osler, with whom were Asst. Atty. Gen. Stuart M. Gerson, Sandra M. Schraibman, Washington, D.C., and Jennifer Segal, Dept. of Treasury, for defendant.

## OPINION

WIESE, Judge.

In March of 1989, the Bureau of Alcohol, Tobacco and Firearms ("ATF") announced that it would reexamine its earlier determination that semiautomatic, assault-type rifles were suitable for "sporting purposes," and could, therefore, be imported into the United States. Initially ATF suspended, and ultimately it revoked, all import permits for this type of weapon. Simultaneously, the Agency also undertook to review the suitability for importation of several other types of weapons, including .22 caliber rimfire semiautomatic rifles.

Plaintiff is an arms importer who was adversely affected by these actions. In this suit, Mitchell asserts takings claims based upon (i) ATF's suspension and revocation of four permits allowing for the importation of semiautomatic rifles from Yugoslavia, and (ii) the Agency's temporary moratorium on the issuance of import permits for the .22 caliber rifles. The essence of Mitchell's claims is that an import license, once relied upon by an importer to support investment decisions, is elevated into a property interest and as such is not revocable by the Government without payment of just compensation. For its part, the Government denies there are any constitutionally compensable interests at stake.

These issues are before us on defendant's motion to dismiss or, in the alternative, for summary judgment, and plaintiff's cross-motion for partial summary judgment on liability. The court heard oral argument on the motions on March 31, 1992, at the conclusion of which it indicated a likelihood that the ruling would go in defendant's favor. After additional consideration of the issues, that preliminary judgment is confirmed. The court holds that the injury complained of is not redressable as a taking because plaintiff does not hold

a property interest within the meaning of the Just Compensation Clause of the Fifth Amendment.

## BACKGROUND

Mitchell Arms is a federally-licensed firearms importer involved in the sale of commercial firearms to wholesale distributors and retail dealers. In 1986, Mitchell Arms entered into a written contract with the Federal Directorate of Supply of Yugoslavia, pursuant to which the Directorate agreed to sell and Mitchell Arms agreed to buy certain firearms, commonly called "assault rifles." Mitchell Arms applied for permits to import samples of each of the rifles which were the subject of the contract. These permits were issued and samples of each rifle were imported and submitted to ATF. After physical inspection of the rifles, ATF determined that they met the "sporting purposes" test of the applicable federal statute, the Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921–930 (1988),[1] and were therefore suitable for importation into the United States.

Following approval of the samples, Mitchell applied for permits to import the rifles and accessories that were the subject of its contract with the Directorate. These permits were granted and importation of the weapons was thus begun. Import permits are, however, only valid for six month periods. Accordingly, it was necessary for Mitchell to reapply for its permits on a periodic basis in order to be able to continue importation of the assault rifles. Such renewal permits were regularly granted to Mitchell.

On November 1, 1988, Mitchell once again applied to ATF for the renewal of four permits involving, this time, a combined request seeking import authority for 9,000 assault rifles. These requests were approved by ATF in early December. On March 9, 1989, Mitchell also applied for a permit to continue the importation of the rifle's accessories; this too was granted.

On March 14, 1989, ATF announced that it was suspending action on pending applications to import several makes of semiautomatic, assault-type rifles, including the types of rifles which Mitchell was then importing. The Agency took this action because it wanted to review whether weapons such as the assault rifle (and also the .22 caliber semiautomatic rimfire rifle), continued to satisfy the "sporting purposes" test of 18 U.S.C. § 925(d). Pending the completion of this review, ATF advised that no import permits for these weapons would be issued.

Following this public announcement by ATF, Mitchell contacted that Agency to inquire whether the suspension would affect its four outstanding import permits for assault rifles. Though the parties' accounts of the resulting telephone conversation differ slightly, according to the affidavit of Don Mitchell (plaintiff's president), he was told by the Assistant Chief of the Imports Branch of ATF that the suspension had no effect on already approved permits. "She told me, in substance or effect, that Mitchell Arms, Inc. could rely upon its already approved permits."

Soon after this conversation with ATF's assistant chief, plaintiff's president traveled to Europe to attend an international gun exhibition. At this exhibition, he met with a representative of the firearms manufacturer. Plaintiff's president advised the manufacturer's representative that, in view of the actions taken by ATF, continued renewal of the import permits did not seem

---

**1.** The Gun Control Act of 1968 vests the Secretary of the Treasury with, among other powers, the authority to regulate the importation of firearms into the United States. The Secretary, in turn, has duly delegated this authority to the Director of ATF. *See* Treasury Department Order No. 120–01 (formerly No. 221), 37 Fed.Reg. 11,696 (June 10, 1972).

The Act expressly prohibits the importation of firearms into the United States unless the firearms satisfy one of the conditions set forth in 18 U.S.C. § 925(d). *See* 18 U.S.C. § 922(*1*). Of relevance to this action, section 925(d)(3) provides, in part, that the Secretary (or ATF, as the Secretary's delegatee) shall authorize the importation of a firearm that "is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1986 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes."

likely. He (Don Mitchell) therefore requested the manufacturer's representative to hasten the production and shipment of the remaining contract quantities in order to complete the contract within the three months still open under the existing permits. Before undertaking manufacture of the remaining contract quantities, however, the arms manufacturer required that payment for the weapons be secured by an irrevocable letter of credit.

On March 21, 1989—a date preceding Mitchell's finalization of its contract financing arrangements—ATF decided to suspend all existing permits for the importation of assault-type rifles pending the results of a study to determine whether these weapons continued to satisfy the statutory test: "suitable for or readily adaptable to sporting purposes." Formal notice of the suspension action was conveyed to Mitchell by a letter from ATF dated March 28, 1989. Mitchell received ATF's letter on March 31, 1989; three days later Mitchell executed an agreement finalizing its financing arrangements.

The weapons were shipped to Mitchell in April and May of 1989 and arrived in New York and Los Angeles in May 1989. However, because of the absence of valid import licenses, the Customs Service refused to allow the weapons to enter commercial channels. Instead, the weapons were held by Customs in a warehouse.

On July 13, 1989, ATF again contacted Mitchell, this time to advise that the Agency had reached a preliminary determination that assault rifles no longer satisfied the statutory criteria for importation and that it was therefore proposing to ban all further importation of these weapons, including those covered under then-suspended permits. The basis for this determination was set out in a report that was included in ATF's letter. Mitchell was also advised that ATF's letter was not a final decision and, indeed, that before such a decision was reached, those wishing to contest the Agency's action could submit their written comments for consideration.

Mitchell, along with numerous other interested organizations, responded to the proposed restriction on import permits for assault-type rifles. On November 6, 1989, the Director of ATF issued a comprehensive final decision evaluating, and rejecting, the various arguments that had been made in support of continued importation of these weapons.

Also rejected by ATF was a request that the import ban not be extended to those weapons whose importation had previously been approved. On this point, the decision stated: "The public interest in, and statutory requirement of, preventing a flood of nonsporting rifles into this country outweighs the prospect of financial hardships resulting from the immediate imposition of this changed determination. Consequently, I must apply this determination retroactively in the public interest."

However, in recognition of the hardship resulting from the retroactive application of the import restriction, and in an effort to help lessen that burden, the decision noted that "ATF has advised importers that they may sell these firearms to certain Government agencies, including law enforcement agencies, pursuant to 18 U.S.C. § 925(a), and that we would provide assistance in dealing with the Department of State regarding the required export license needed for the exportation of firearms which have already arrived in this country. Additionally, importers are free to submit to ATF modified versions of semiautomatic weapons for evaluation."

Several months after the revocation of its import permits, Mitchell wrote to ATF proposing a modification of those characteristics of the assault rifles that had resulted in the finding of unsuitability for sporting purposes. Then, on April 30, 1990, Mitchell applied for a permit for release of the rifles to permit their reconfiguration and resale. A prototype of the reconfigured weapon was submitted to ATF for its evaluation on May 14, 1990 and approval for importation of the modified weapon was granted Mitchell on September 26, 1990. This approval was conditioned on Mitchell's agreement to modify the weapons and ATF's inspection and approval of the modified version of the weapons.

The permit allowing for Mitchell's importation of modified assault-type weapons was several times extended. Although the record does not give an exact figure, it appears that through the sale of reconfigured weapons, Mitchell was able to dispose of approximately half of the initial import quantity of 9,000 assault rifles. The balance remains in a Customs Service warehouse. The record also leaves uncertain whether sale of the reconfigured weapons produced a profit for Mitchell or merely reduced the extent of its loss. In either case, the contention Mitchell advances in this suit is that loss of the opportunity to sell the assault rifles in their original configuration amounted to a taking of property for which compensation is now due from the Government.

With respect to the other action taken by ATF that is complained of here, namely, the suspension of action on applications to import .22 caliber semiautomatic rimfire rifles, this moratorium remained in effect for approximately 90 days, *i.e.,* from April 5, 1989 to July 6, 1989. Based on the results of the study completed during this three month period, approval of permits to import .22 caliber semiautomatic rimfire rifles was resumed after July 6, 1989.

Mitchell's contention is that because of the three-month moratorium, it was deprived of a net monthly profit (from the sale of .22 caliber weapons) of approximately $25,000. Like its principal claim, Mitchell seeks the recovery of this alleged monthly loss (a total of $75,000) under a taking theory.

## DISCUSSION

■ The Just Compensation Clause of the Fifth Amendment prohibits the Federal Government from taking private property without the payment of just compensation. The term "property," as used in the law of takings, does not call on the ordinary or usual meaning of that word, *i.e.,* a reference to a thing or a possession, but rather denotes a broader concept, namely, the legal attributes of ownership. As the Supreme Court has explained it, property within the meaning of the Just Compensation Clause identifies "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). In a constitutional sense then, a taking involves a displacement, by Government action, of the exclusive rights to control that are the essential characteristics of private ownership.

■ It follows, therefore, that the question we must begin with here is whether the interests which plaintiff held in the import licenses were such as to qualify those licenses as property for purposes of the Just Compensation Clause. Did the licenses convey to plaintiff rights of unrestricted use, enjoyment, and disposal characteristic of private property? They did not.

The licenses were not transferable (plaintiff could not sell its license to other importers); they conveyed no exclusive right of use (identical licenses remained issuable to other importers); they held out no promise of renewal (the licenses were issued for six month periods only and contained no assurances of continuity); and finally, and perhaps most important, they contained no guarantee against revocation (enjoyment of the licenses remained, at all times, subordinate to the Government's plenary power to regulate "commerce with foreign nations." U.S. Const. art. I, § 8, cl. 3). These licenses, therefore, bore none of the characteristics of a vested property right. Hence, the loss of these licenses cannot be considered a compensable taking.

A similar result—the lack of a vested property interest—also defeated the taking claim asserted in *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). There the question presented was whether a statutory change restricting California's contractual right to withdraw from the Social Security system constituted the taking of a valuable property interest for which just compensation was due. It was held that the right to withdraw did not rise to the level of "prop-

erty" within the meaning of the Fifth Amendment.

In reaching this conclusion, the Court pointed out that the termination clause (the right to withdraw) was not a term over which the State held any bargaining power or for which it had provided any consideration. Nor, for that matter, was the clause unique to the State's contract. Rather, said the Court, "the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare." *Id.* at 55, 106 S.Ct. at 2398. "Under these circumstances," the Court continued, "we conclude that the termination provision in California's [contract] did not rise to the level of 'property.' The provision simply cannot be viewed as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing ... language of reservation." *Id.*

Admittedly, the *Bowen* decision is a much different case on its facts than the one we deal with here. However, its basic teaching is squarely on point. At bottom, *Bowen* stands for the proposition that enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control. *Dames & Moore v. Regan*, 453 U.S. 654, 674 n. 6, 101 S.Ct. 2972, 2984 n. 6, 69 L.Ed.2d 918 (1981).

Mitchell finds itself in the same position as the claimants in *Bowen.* There the Government was acting under its power "to ... provide for the ... general Welfare of the United States," U.S. Const. art. I, § 8; here it is the power "[t]o regulate Commerce with foreign Nations." *Id.* In both instances, the proper exercise of the power demands that it be allowed to operate without restraint except such as the Constitution itself might impose. Thus, the Government's power to determine in the first instance the circumstances under which a license may be issued necessarily implies the power to also determine the circumstances appropriate to its revocation.

Without conceding the above conclusion, plaintiff raises the argument that even if an import license, *per se,* does not rise to the level of a property right for takings purposes, a different case exists when that license has been economically validated (the court's words) by the investment of private capital. Under such circumstances, says plaintiff, revocation of the licenses becomes actionable as a taking.

We cannot accept this argument. All licenses, we may assume, are issued with the expectation that they will be relied upon. Yet government as we know it would soon cease to exist if such exclusively governmental functions as the control over foreign commerce could not be accomplished without the payment of compensation to those business interests that have chosen to operate within this highly regulated area. "To require compensation in all such circumstances would effectively compel the government to regulate by *purchase.*" *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979) (emphasis in original).

Plaintiff purports to find a different answer in the decisions in *United Nuclear Corp. v. United States,* 912 F.2d 1432 (Fed. Cir.1990), and *NRG Co. v. United States,* 24 Cl.Ct. 51 (1991). Both cases are offered in support of the proposition that the loss of investment resulting from the Government's nonrenewal or cancellation of a permit constitutes a deprivation of property for which just compensation must be paid. We do not agree with plaintiff's reading of these cases.

The core problem confronted in these two decisions involved the refusal of the Secretary of the Interior, acting in his capacity as trustee of Indian lands, to sanction a continuance of the private mining interests operating on these lands absent approval of the tribe involved. Specifically, in *United Nuclear* the taking claim grew out of the Secretary's refusal to override the Navajo Tribe's disapproval of the corporation's plan for the extraction of uranium from leased tribal lands—an action which effectively destroyed the value of

United Nuclear's leasehold interest in those lands.

The problem in *NRG* was similar. There the issue centered on permits to prospect for coal on lands belonging to the Northern Cheyenne Tribe. The permits were subject to a two-year right of renewal and, in addition, they provided each permittee (which included NRG) with a right to obtain a lease on the lands embraced in its permit. Tribal objection to the renewal of the permits led initially to their suspension by the Secretary and, eventually, to their cancellation by act of Congress. As in *United Nuclear*, NRG's resulting taking claim focused on the loss of its leasehold.

As we have indicated, neither of these cases has any relevance to the present situation. The property taking that each of these decisions recognized was not premised—as plaintiff's argument seems to suggest—on the Government's naked refusal to renew the necessary permit. That is, it was not simply the thwarting of an investment-backed expectancy that gave rise to the right of compensation. Rather, it was the adverse effect of the Secretary's action on the opportunity to exploit the possessory interest in the Indian lands (the leasehold) that occasioned the losses deemed compensable. The interest affected—the *right to mine*—was inherent in the ownership rights that United Nuclear and NRG held *independent* of their denied permits.

We do not encounter a parallel situation here. In this case, the interest affected by ATF's actions—the right to sell assault weapons in domestic commerce—is not a right inherent in plaintiff's ownership of those weapons. That right comes into being only upon the issuance of an import permit. Since however, it is the Congress alone which has the power to regulate commerce with foreign nations, plaintiff does not have an enforceable right to the issuance of an import license. For that same reason then, plaintiff has no basis on which to found a taking claim.

This conclusion is not undermined by the fact that the revocation of plaintiff's import licenses could not be carried out without adherence to the procedural protections afforded by the Administrative Procedure Act, 5 U.S.C. § 558 (1988). That plaintiff may hold a property interest for purposes of procedural due process guarantees does not also mean that it simultaneously holds a property interest for purposes of the Just Compensation Clause. The two, in fact, are not the same. "A 'legitimate claim of entitlement' to a government benefit does not transform the benefit *itself* into a vested right. Rather, due process 'property interests' in public benefits are 'limited, as a general rule, by the governmental power to remove, through prescribed procedures, the *underlying source of those benefits.*'" *Kizas v. Webster*, 707 F.2d 524, 539 (D.C.Cir.1983) (emphasis in original) (quoting *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 796, 798, 100 S.Ct. 2467, 2481, 2482, 65 L.Ed.2d 506 (1980) (Blackmun, J., concurring in the judgment)), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

Moving on to the other principal issue presented in this case—the claim of a temporary taking based on ATF's three-month moratorium on the issuance of import permits for .22 caliber semiautomatic rimfire rifles—that matter has already been answered: there is no enforceable right to a license; hence there is no taking.

## CONCLUSION

For the reasons given in this opinion, the court concludes that Mitchell Arms, Inc. has not stated a claim on which relief can be granted. Defendant's motion to dismiss is therefore allowed. The Clerk is directed to enter judgment dismissing the complaint pursuant to Rule 12(b)(4).