MITCHELL ARMS, INC., Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee.

No. 92–5125.

United States Court of Appeals, Federal Circuit.

Oct. 14, 1993.

Alvin S. Kaufer, Nossaman, Guthner, Knox & Elliott, Los Angeles, CA, argued for plaintiff-appellant. With him on the brief was John Ossiff, of counsel.

Mark B. Stern, Atty., Dept. of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen. and Michael Jay Singer, Atty.

Before RICH, LOURIE, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Mitchell Arms, Inc. (Mitchell), appeals from the April 14, 1992 judgment of the United States Claims Court dismissing its complaint under Rule 12(b)(4) of the United States Claims Court (RUSCC) for failure to state a claim upon which relief could be granted.[1] In its complaint, Mitchell contended that the actions of the Bureau of Alcohol, Tobacco, and Firearms (ATF) revoking permits issued to Mitchell for the importation of certain firearms and suspending for ninety days the permits for the importation of certain other firearms constituted compensable takings under the Fifth Amendment of the United States Constitution. In ordering the dismissal of Mitchell's complaint, the Claims Court concluded that Mitchell had not asserted the kind of property right that could be the subject of a taking claim. *Mitchell Arms, Inc. v. United States*, 26 Cl.Ct. 1 (1992). We affirm.

## BACKGROUND

The pertinent facts are not in dispute. The Gun Control Act of 1968, Pub.L. No. 90–612, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921–930 (1988)), provides four exceptions to a general prohibition on the importation of firearms. Under one of those exceptions, the Secretary of the Treasury, through ATF, "shall authorize" the importation of firearms which are, among other limitations, "generally recognized as particularly suitable for or readily adaptable to sporting purposes...." 18 U.S.C. § 925(d)(3).

Mitchell is a federally-licensed firearms importer involved in the sale of commercial firearms to wholesale distributors and retail dealers. In 1986, it entered into a contract with the Federal Directorate of Supply of Yugoslavia (the Directorate) to buy certain firearms, commonly referred to as "assault rifles."[2]

Mitchell submitted for ATF inspection a sample of each rifle to be imported under its

---

1. As of October 29, 1992, the United States Claims Court became the "United States Court of Federal Claims," pursuant to the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516. We will refer to the court by the name which it had while this matter was pending before it.

2. Use of the term "assault rifles" to describe the firearms at issue is somewhat of a misnomer. True assault rifles typically have selectable fire modes, including a fully automatic mode. As used throughout the litigation of this case and in this opinion, the term "assault rifles" is generically used to describe a commercial class of semiautomatic firearms having an appearance similar to military weapons and a large capacity ammunition magazine.

contract with the Directorate. In 1987, after approval of the samples, ATF issued Mitchell permits authorizing the importation of the rifles. Each import permit was valid for six months and specified a type and quantity of firearms. Once a permit expired, a new permit was required in order for Mitchell to continue importation of the previously-approved firearms. *See* 27 C.F.R. § 178.112(b) (1988).

Mitchell imported rifles under the permits throughout 1987 and 1988. In December of 1988, Mitchell obtained renewal of four permits authorizing the importation of some 9,000 assault rifles.

On March 14, 1989, ATF issued a news release announcing the suspension of pending applications for import permits. Following the announcement, Mitchell contacted ATF and was told that it could rely on its issued permits. Shortly thereafter, Mitchell confirmed an order with the Directorate for a quantity of assault rifles. Mitchell apparently intended to import the rifles under its existing permits, which were to expire in June of 1989. Before manufacturing the rifles, however, the Directorate required that Mitchell obtain an irrevocable letter of credit in order to pay for the firearms.

On March 21, 1989, ATF suspended the importation of assault rifles under existing permits, pending a study to determine if the assault rifles identified in the permits met revised criteria for the sporting purposes exception of 18 U.S.C. § 925(d). Mitchell received notification of the suspension on March 31, 1989. On April 3, 1989, Mitchell executed an irrevocable letter of credit formalizing the financial arrangements for its March order with the Directorate.

The assault rifles were shipped to Mitchell in April and May of 1989, arriving at Los Angeles and New York port facilities. The United States Customs Service refused entry of the rifles for lack of a valid import permit.

On July 12, 1989, ATF issued a preliminary determination generally banning further importation of assault rifles. In the determination, ATF found that assault rifles like the ones covered by Mitchell's suspended permits no longer satisfied the statutory criteria for importation under the sporting purposes exception. In conjunction with the suspension and revocation of permits to import assault rifles, ATF also temporarily suspended permits to import .22 caliber semiautomatic rimfire rifles, to the detriment of Mitchell, which was in the process of importing such rifles. This suspension lasted approximately ninety days.

After receiving comment from Mitchell and other interested parties, ATF issued a final decision on November 6, 1989, rejecting the various arguments for continued importation of assault rifles. In its final decision, ATF refused Mitchell's request that the ban on assault rifles not be extended to weapons for which import permits had previously been approved.

The final ATF decision included provisions designed to alleviate the hardship resulting from the revocation of existing permits. Specifically, ATF advised Mitchell and other affected importers of alternative commercial uses for the banned rifles, including sale to certain government agencies and export to other countries. ATF also suggested that Mitchell modify the rifles to meet new import criteria. Mitchell modified and disposed of approximately half of the original 9,000 rifles seized by the Customs Service.

Gun South, Inc. (Gun South), a firearms importer similarly situated to Mitchell, challenged ATF's authority to temporarily suspend issued import permits and the Customs Service's seizure of its firearms. Gun South sought a declaratory judgment and injunctive relief in federal district court under provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1988). The district court concluded that ATF's actions were *ultra vires* and enjoined further government interference in the importation of firearms under validly issued permits. On appeal, the United States Court of Appeals for the Eleventh Circuit reversed, concluding, contrary to the district court, that ATF had not acted outside the scope of its statutory authority when it temporarily suspended Gun South's permits. *See Gun South, Inc. v. Brady,* 877 F.2d 858, 861–64 (11th Cir.1989), *rev'g* 711 F.Supp. 1054 (N.D.Ala.1989).

On October 19, 1990, Mitchell filed an action in the Claims Court alleging that the suspension and revocation of its import permits constituted a compensable taking under the Fifth Amendment. As noted above, the Claims Court dismissed Mitchell's complaint for failure to state a claim upon which relief could be granted. In its decision accompanying the order to dismiss, the court concluded that neither the permits themselves nor Mitchell's expectations arising from the combination of the permits and its contract with the Directorate amounted to "a property interest" within the meaning of the Just Compensation Clause of the Fifth Amendment. This appeal followed.

## DISCUSSION

### I

### THE STANDARD OF REVIEW

■ A motion to dismiss for failure to state a claim upon which relief can be granted is appropriate where the plaintiff cannot assert a set of facts which would support its claim. *Chang v. United States,* 859 F.2d 893, 894 (Fed.Cir.1988). In reviewing the granting of a motion to dismiss under RUSCC 12(b)(4), we must "assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *Gould v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). We review the Claims Court's legal conclusions *de novo. Id.* at 1273.

As noted above, in this case, the pertinent facts are not in dispute. The issue decided by the Claims Court, and before this court on appeal, is whether the presumptively correct actions of ATF in suspending and revoking the permits constituted a compensable taking under the Fifth Amendment. *Florida Rock Indus. v. United States,* 791 F.2d 893, 899 (Fed.Cir.), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1986) (in the context of a taking claim premised on the denial of a permit, the lawfulness of the denial must be taken as a given). In any event, Mitchell does not contend that ATF's actions in this matter were unlawful. Mitchell's brief at 32.

### II

### ANALYSIS

The Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." As we pointed out in *Atlas Corp. v. United States,* 895 F.2d 745, 756 (Fed.Cir.1990), "the Fifth Amendment requires compensation for losses due to government action only where there has been a 'taking' of 'property' for public use." As seen above, the Claims Court concluded that Mitchell had not asserted the kind of property right that could be the subject of a taking claim.

■ Mitchell does not contend that either the firearms or the permits constituted the property that was taken. Rather, it argues that its contractual relationship with the Directorate, which it says was entered into in reliance upon the issued permits, gave rise to a reasonable investment-backed expectation protected by the Fifth Amendment. Put another way, Mitchell claims that a property interest was created when it agreed to purchase the assault rifles with an expectation of importing them under the issued permits. Thus, Mitchell asks us to hold that its investment-backed reliance on the issued import permits constituted "property" within the meaning of the Fifth Amendment. We decline to do so.

The chief and one of the most valuable characteristics of the bundle of rights commonly called "property" is "the right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the Government." *Hendler v. United States,* 952 F.2d 1364, 1374 (Fed.Cir. 1991) (citation omitted). In this case, Mitchell did not possess such a right.

In holding that Mitchell had not asserted a property right protected by the Fifth Amendment, the Claims Court relied upon *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). In *Bowen,* the Court addressed a statutory change restricting the State of California's contractual right to withdraw from the Social Security system.

When Congress enacted the Social Security Act of 1935, it expressly reserved to itself "[t]he right to alter, amend, or repeal any provision of" the Act. Social Security Act of 1935, ch. 531, § 1104, 49 Stat. 620, 648 (current version at 42 U.S.C. § 1304 (1988)). In 1950, Congress enacted Section 418 of the Act to permit States to participate in the Social Security System on a voluntary basis by entering into agreements with the federal government (§ 418 Agreements). *Bowen,* 477 U.S. at 45, 106 S.Ct. at 2393. As originally enacted, and through 1983, Section 418 permitted States to terminate their § 418 Agreements and thereby withdraw from the Social Security System. 42 U.S.C. § 418(g)(1) (1982). In due course, California entered into a § 418 Agreement.

In 1983, Congress amended Section 418 by repealing the termination provision. Social Security Amendments of 1983, Pub.L. No. 98–21, § 103, 97 Stat. 65, 71–72. California filed suit to enjoin enforcement of amended section 418(g) and also sought a declaration that the amended section was unconstitutional. The United States District Court for the Eastern District of California agreed, reasoning that the contractual right to withdraw, which was set forth in California's § 418 Agreement, constituted "private property" within the meaning of the Just Compensation Clause of the Fifth Amendment.

On appeal, the Supreme Court reversed and held that the statutory change restricting California's contractual right to withdraw from the Social Security System did not constitute the taking of a property interest for which just compensation was due. The Court decided that California's contractual right to withdraw did not rise to the level of "property" within the meaning of the Fifth Amendment. 477 U.S. at 55, 106 S.Ct. at 2398. The Court noted that the termination provision "was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare." *Id.* Accordingly, the Court concluded, the termination provision in California's § 418 Agreement did not rise to the level of property because it could not be viewed "as conferring any sort of 'vested right' in the face of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation." *Id.*

■ The holding in *Bowen* rests upon the fact that, when Congress established the Social Security System, it reserved the right to change the System. We thus agree with the Claims Court that "*Bowen* stands for the proposition that enforceable rights sufficient to support a taking claim against the United States cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control." 26 Cl.Ct. at 5 (citation omitted). The reason "enforceable rights sufficient to support a taking claim" cannot arise in such an area is that when a citizen voluntarily enters such an area, the citizen cannot be said to possess "the right to *exclude*". *Hendler,* 952 F.2d at 1374. And the reason the citizen cannot be said to possess "the right to exclude" is that the citizen is in an area subject to government control. Mitchell voluntarily entered the firearms import business, thereby knowingly placing itself in the governmentally controlled arena of firearms importation under the Gun Control Act, just as California, by entering into a § 418 Agreement, knowingly placed itself in the governmentally controlled arena of the Social Security System. Under these circumstances, Mitchell's expectation of selling the assault rifles in the United States—which expectation necessarily flowed from the ATF permits—could not be said to be a property right protected under the Fifth Amendment.

We view this case as analogous to the situation in *Allied–General Nuclear Services v. United States,* 839 F.2d 1572 (Fed.Cir.), *cert. denied,* 488 U.S. 819, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988). There, the plaintiff alleged a taking based upon the government's denial of a permit to operate a plutonium recycling plant. The government actively promoted and induced the plaintiff's expenditure of over $200 million to build the plant. Upon the plant's completion, however, the government, having reconsidered its policy regarding nuclear proliferation, refused to issue the expected operating permit, thereby rendering the plaintiff's investment useless.

This court affirmed the Claims Court's finding that no compensable taking had occurred, stating that "the basic rule that is dispositive here is that as against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public." *Id.* at 1576. Just as Allied General's expectation of operating the plutonium recycling plant was found not to be a property right protected by the Fifth Amendment because it was subject to governmental regulation of nuclear facilities, so too Mitchell's expectation of selling its assault rifles in the United States was not such a property right because it was subject to governmental regulation of firearms importation under the Gun Control Act.

█ Mitchell contends that its interest arising from the permits is analogous to the possessory leasehold interests held in Indian lands by the plaintiffs in *United Nuclear Corp. v. United States,* 912 F.2d 1432 (Fed. Cir.1990), and *NRG Co. v. United States,* 24 Cl.Ct. 51 (1991). We disagree.

"[T]he Fifth Amendment concerns itself solely with the 'property,' i.e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership." *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945). In revoking the permits, ATF withdrew its prior authorization for Mitchell to sell certain types of assault rifles in the United States. Otherwise, Mitchell retained complete control over the rifles. Mitchell could have done anything it wished with the rifles, except import them into the United States in their original configuration. Put another way, ATF did not take the rifles. Rather, it "took" from Mitchell the ability to realize an expectation in the ultimate market disposition of the rifles. This "collateral interest" incident to Mitchell's ownership of the rifles is not property protected by the Fifth Amendment. As the Claims Court stated:

> In this case, the interest affected by ATF's actions—the right to sell assault weapons in domestic commerce—is not a right inherent in plaintiff's ownership of those weapons. That right comes into being only upon the issuance of an import permit. Since however, it is the Congress alone which has the power to regulate commerce with foreign nations, plaintiff does not have an enforceable right to the issuance of an import license. For that same reason then, plaintiff has no basis on which to found a taking claim.

26 Cl.Ct. at 6.

As the Claims Court recognized, in both *United Nuclear* and *NRG,* "[t]he interest affected—the right to mine—was inherent in the ownership rights that United Nuclear and NRG held *independent* of their denied permits." 26 Cl.Ct. at 6. By contrast, as just noted, Mitchell's expectation of selling the assault rifles in domestic commerce—the interest affected in this case—was not inherent in its ownership of the rifles. Rather, it was totally *dependent* upon the import permits issued by ATF. In short, Mitchell's ability to import the rifles and sell them in the United States was at all times entirely subject to the exercise of ATF's regulatory power. Consequently, any expectation which arose on Mitchell's part as a result of the import permits did not constitute a property right protected by the Fifth Amendment.

### CONCLUSION

Mitchell has failed to realize the revenues it anticipated when it contracted with the Directorate to purchase assault rifles. However, the frustration of Mitchell's financial expectations by the unforeseen revocation of the import permits did not amount to the taking of a property right protected by the Fifth Amendment. We thus affirm the judgment of the Claims Court dismissing Mitchell's complaint for failure to state a claim upon which relief could be granted.[3]

*AFFIRMED.*

---

**3.** Our holding with respect to Mitchell's claim based upon the revocation of the import permits for the assault rifles compels a similar result in the case of Mitchell's claim based upon the 90-day suspension of the import permits for the .22 caliber semiautomatic rimfire rifles.