United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 3, 2001 Decided June 14, 2002 

 No. 00-5409

 Springfield, Inc., 
 Appellant

 v.

 Bradley A. Buckles, Director, Bureau of Alcohol, 
 Tobacco and Firearms, U.S. Department of the Treasury, 
 Appellee

 Appeal from the United States District Court 
 for the District of Columbia 
 (99cv01224)

 Stephen P. Halbrook argued the cause for appellant. With 
him on the briefs was Richard E. Gardiner.

 Michael S. Raab, Attorney, U.S. Department of Justice, 
argued the cause for appellee. With him on the brief were 
Roscoe C. Howard, Jr., U.S. Attorney, and Mark B. Stern, 
Attorney, U.S. Department of Justice.

 Stuart J. Land, Robert S. Litt and Robert J. Katerberg 
were on the brief for amicus curiae The Brady Center to 
Prevent Gun Violence, et al.

 Before: Ginsburg, Chief Judge, Randolph and Tatel, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Randolph, Circuit Judge: The Secretary of the Treasury 
must authorize the importation of any firearm that is "of a 
type" "generally recognized as particularly suitable for or 
readily adaptable to sporting purposes." 18 U.S.C. 
s 925(d)(3). In April 1998, the Secretary announced that 
modified semiautomatic assault rifles with the ability to ac-
cept large capacity military magazines do not satisfy 
s 925(d)(3), and therefore may not be imported pursuant to 
that section. As a result, the Bureau of Alcohol, Tobacco and 
Firearms, an agency within the Treasury Department, re-
voked import permits held by Springfield, Inc., for two makes 
of rifles and denied Springfield's import applications. The 
company sued the Director of BATF for an order compelling 
issuance of the permits. The district court granted summary 
judgment against Springfield.

 I.

 The Gun Control Act of 1968 vests the Treasury Secretary 
with authority to regulate the importation of firearms. The 
Secretary has delegated his authority to the Director of 
BATF. See 18 U.S.C. s 922(a)(1); Treas. Dep't Order No. 
120-01 (June 6, 1972). Aside from "curios" or "relics," see 18 
U.S.C. s 925(e), no firearm may be imported unless it:

 (1) is being imported or brought in for scientific or 
 research purposes, or is for use in connection with com-
 petition or training pursuant to [firearms programs of 
 the U.S. Army, 10 U.S.C. s 4301 et seq.];
 
 (2) is an unserviceable firearm, other than a machine-
 gun as defined in [26 U.S.C. s 5845(a)] (not readily 
 restorable to firing condition), imported or brought in as 
 a curio or museum piece;
 
 (3) is of a type that does not fall within the definition 
 of a firearm as defined in [26 U.S.C. s 5845(a)] and is 
 generally recognized as particularly suitable for or readi-
 ly adaptable to sporting purposes, excluding surplus mili-
 tary firearms, except in any case where the Secretary 
 has not authorized the importation of the firearm pursu-
 ant to this paragraph, it shall be unlawful to import any 
 frame, receiver, or barrel of such firearm which would be 
 prohibited if assembled; or
 
 (4) was previously taken out of the United States or a 
 possession by the person who is bringing in the firearm 
 or ammunition.
 
18 U.S.C. s 925(d).

 A BATF study in 1989 identified several characteristics of 
the modern military assault rifle. These included the ability 
to accept a detachable magazine, folding/telescoping stocks, 
separate pistol grips, ability to accept a bayonet, flash sup-
pressors, bipods, grenade launchers, and night sights. Re-
port and Recommendation of the ATF Working Group on the 
Importability of Certain Semiautomatic Rifles 6-8 (1989) 
[hereinafter ATF Working Group]. As to detachable maga-
zines, the agency reported that

 Virtually all modern military firearms are designed to 
 accept large, detachable magazines. This provides the 
 soldier with a fairly large ammunition supply and the 
 ability to rapidly reload. Thus, large capacity magazines 
 are indicative of military firearms. While detachable 
 magazines are not limited to military firearms, most 
 traditional semiautomatic sporting firearms, designed to 
 accommodate a detachable magazine, have a relatively 
 small magazine capacity. In addition, some States have 
 a limit on the magazine capacity allowed for hunting, 
 usually 8 rounds or less. That a firearm is designed and 
 sold with a large capacity magazine, e.g., 20-30 rounds, is 
 a factor to be considered in determining whether a 
 firearm is a semiautomatic assault rifle.
 
Id. at 6-7. After the 1989 study, BATF took the position that 
a rifle with any of these military configurations, other than 
the ability to accept a large magazine, failed the sporting 
purpose test of s 925(d)(3). See Department of Treasury 
Study on the Sporting Suitability of Modified Semiautomatic 
Assault Rifles 11 (1998) [hereinafter Treasury Department 
Study]. Manufacturers responded by modifying their weap-
ons to remove these seven military features. 

 From 1989 through 1997, BATF permitted Springfield to 
import rifles known as the "SAR8 Sporter" and the 
"SAR4800 Sporter" (and other slightly-altered versions of 
these two rifles with, for example, longer barrels). The SAR8 
Sporter is a modified version of an assault rifle produced by a 
German firearms manufacturer, Heckler & Koch. The 
SAR4800 Sporter is a modified version of the FN-FAL, a 
Belgian weapon.1 Both of Springfield's rifles have the ability 
to accept large, military-style magazines.

 In 1997, a group of Senators complained to the President 
about the importation of "military-style assault weapons" 
such as modified versions of the Israeli-made Uzi. At the 
direction of the President, BATF temporarily suspended all 
import licenses for "modified semiautomatic assault-type ri-
fles," including Springfield's. In a study completed six 
months later, the Treasury Department concluded that rifles 
which can accept large capacity, detachable magazines--those 
containing more than 10 bullets--are not firearms "generally 
recognized as particularly suitable for or readily adaptable to 
sporting purposes" within s 925(d)(3). See generally Trea-
sury Department Study.

 BATF notified Springfield by letter that it proposed to 
suspend the company's import permits for the SAR8 and the 
SAR4800 on the ground that these firearms did not qualify 
under s 925(d)(3), citing the study. Springfield responded by 
reminding BATF of its earlier decision--made in 1989--to 
permit importation of Springfield's rifles. The company saw 

__________
 1 The basis for BATF granting import permits to Springfield for 
these rifles (e.g., what particular sporting purposes were involved) is 
not clear from the record.

no reason for a different conclusion nine years later and 
urged a return to the prior decision. Without supplying any 
fresh information, Springfield argued that the "ability to 
accept a large capacity military magazine is also the ability to 
accept a small capacity non-military magazine" and that 
"[s]ome shooting sports require a large capacity magazine 
and some require a small capacity magazine."

 In January 1999, the BATF Director issued his final judg-
ment rejecting Springfield's administrative "appeal" and sus-
pending its import licenses. The Director rejected the idea 
that the rifles had a sporting purpose because no military 
would use them in combat and because the rifles could be 
used for target shooting or hunting. Citing the 1998 study, 
the Director pointed out that criminals often use such rifles. 
The Director also reiterated that it is the ability to accept a 
large capacity magazine, not the size of the magazine actually 
used, which prevents the Springfield rifles from being gener-
ally recognized as having a sporting purpose. The Director 
refused to infer a sporting purpose for the Springfield fire-
arms from the fact that Congress--when it passed the 1994 
assault weapons ban, 18 U.S.C. s 922(v)--did not completely 
ban a similar weapon. Finally, the Director pointed out that 
the company provided no evidence to support its assertion 
that some shooting sports require a large capacity magazine.

 For the most part, the BATF Director adhered to the 
interpretation of s 925(d)(3) comprehensively set forth in a 
1989 Director's decision revoking the importation permits of 
Mitchell Arms, Inc. The 1989 decision described the agency's 
view of s 925(d)(3) thus:2 "In over 20 years of administering 
this provision, ATF has interpreted the phrase 'particularly 
suitable for or readily adaptable to' as a unit. The phrase has 
not been dissected and the terms given separate application 
or meaning. Reading the phrase as a whole gives effect to 
the congressional intent that only genuine sporting rifles be 

__________
 2 This decision was the subject of a Takings Clause claim rejected 
by the United States Claims Court and the Federal Circuit. See 
Mitchell Arms, Inc. v. United States, 26 Cl. Ct. 1, 3 (1992), aff'd, 7 
F.3d 212 (Fed. Cir. 1993).

imported." Mitchell Arms, Inc., Decision of the Director 
Revoking Import Permits and Denying Applications for Im-
port Permits 31 (Bureau of Alcohol, Tobacco & Firearms 
Nov. 6, 1989). As to the words "readily adaptable to sporting 
purposes," the 1989 decision rejected the idea that a firearm 
would qualify so long as it could be modified to allow its use 
for activities such as hunting. Such an interpretation "would 
allow the importation of virtually any and all rifles without 
distinction.... As Congress could not sensibly have sought 
to make a firearm importable based on changes that theoreti-
cally could be made after importation, the phrase 'generally 
recognized as particularly suitable for or readily adaptable to 
sporting purposes' must refer to the characteristics of the 
firearm that exist at the time of importation." Id. The 1989 
decision also rejected the argument that "sporting purposes," 
as used in s 925(d)(3), included "every conceivable type of 
activity or competition which might include a firearm. Other-
wise, a 'sporting purpose' could be advanced for every firearm 
sought to be imported." Id. at 22.

 This BATF reading of s 925(d)(3) has remained constant. 
The views expressed in the Director's 1989 decision were also 
preceded by an agency study of assault weapons. See gener-
ally ATF Working Group. The 1998 study, and the Di-
rector's reasoning in support of his revocation of Springfield's 
permits, reflect the agency's earlier construction of 
s 925(d)(3). What changed as a result of the 1998 study, and 
in the Director's decision in this case, is not so much the 
agency's view of the statute, but its application of an interpre-
tation it had long followed.

 II.

 We will not spend much time dealing with the question 
raised by United States v. Mead Corp., 533 U.S. 218 (2001)--
namely, whether Chevron U.S.A. v. Natural Res. Def. Coun-
cil, 467 U.S. 837 (1984), and its requirement of judicial 
deference to reasonable agency interpretations of statutes, 
applies to informal adjudications of the sort we have in this 

case.3 Whether we follow Chevron or simply review the 
Director's statutory construction on the basis of Skidmore v. 
Swift & Co., 323 U.S. 134 (1944), see Am. Fed'n of Gov't 
Employees v. Veneman, 284 F.3d 125, 129 (D.C. Cir. 2002), is 
of no moment. The persuasiveness of the agency's reasoning, 
in both the Director's 1989 and 1999 decisions, the application 
of BATF's expertise, and the lack of evidence to support 
Springfield's assertions, lead us to the same result under 
either line of authority.

 Springfield's first contention is that even if its rifles are not 
"particularly suitable for" "sporting purposes," they are 
"readily adaptable to" that end because they can accept small 
magazines. But s 925(d)(3) also requires that the firearm be 
"generally recognized" as one used in sport. BATF's view, 
ever since the statute became law three decades ago, has 
been to treat the words of s 925(d)(3) as a whole and to view 
the alternative elements--"particularly suitable" or "readily 
adaptable" as interrelated. In other words, there must be 
general recognition that the particular firearm is adaptable to 
sport. Springfield presented no evidence to the Director that 
its rifles, designed to hold large, military magazines, are 
nonetheless "generally recognized" as adaptable to sporting 

__________
 3 Cf. FEC v. Nat'l Rifle Ass'n of Am., 254 F.3d 173, 184-86 (D.C. 
Cir. 2001) (granting Chevron deference to interpretations in FEC 
advisory opinions); In re Sealed Case, 223 F.3d 775, 780 (D.C. Cir. 
2000) (Chevron deference for interpretations in FEC's no-action 
decision). Compare Navaho Nation v. Dep't of Health & Human 
Servs., 285 F.3d 864, 871 (9th Cir. 2002) (Chevron deference to 
interpretation in letter denying application); Pesquera Mares Aust-
rales, Ltda. v. United States, 266 F.3d 1372, 1379-82 (Fed. Cir. 
2001) (Chevron deference to interpretation made during antidump-
ing investigation); American Wildlands v. Browner, 260 F.3d 1192, 
1195 (10th Cir. 2001) (Chevron deference to interpretation ex-
pressed in EPA letter), with Hall v. EPA, 273 F.3d 1146, 1155-56 
(9th Cir. 2001) (denying Chevron deference to interpretation in 
EPA's approval of a revised air quality plan); U.S. Freightways 
Corp. v. Comm'r of Internal Revenue, 270 F.3d 1137, 1141-42 (7th 
Cir. 2001) (declining to defer to interpretation of tax code in IRS 
audit).

purposes. Although the company asserted that its rifles had 
no use other than sport, the Director pointed out that such 
rifles had increasingly been used in the commission of violent 
crimes.4

 Springfield also complains that BATF construed "sporting 
purposes" too narrowly, excluding "various forms of competi-
tions, informal target shooting, plinking, and recreation." 
Brief for Appellant at 20. "The Act makes clear," the compa-
ny also tells us, "that competitions in general, including with 
semiautomatic military rifles, are sporting purposes." Id. at 
18. We see nothing so clear in the statute. Congress did not 
define "sporting purposes." The consistent position of BATF 
has been that s 925(d)(3) comprehends only particular uses of 
a firearm that have "attained general recognition as having a 
'sporting purpose,' " Gilbert Equip. Co. v. Higgins, 709 
F. Supp. 1071, 1075 (S.D. Ala. 1989), and only activities that 
are traditional sports. Otherwise, the prospect of using a 
firearm to shoot at bottles in the backyard or tin cans in the 
woods would qualify it for importation, which of course would 
mean that all firearms must be allowed into the country. 
Such "plinking" therefore has long been considered "primari-
ly a pastime," not a sport within s 925(d)(3)'s meaning. See, 
e.g., Treasury Department Study Ex. 6, reprinting the 1968 
report of the meeting of the Firearms Advisory Panel; ATF 
Working Group 9-11. We find BATF's interpretation of 
"sporting purposes," in this respect, to be persuasive.5

__________
 4 The 1998 study reported an increase in the criminal use of rifles 
with large capacity magazines. In 1991, police submitted trace 
requests for only seven such rifles. In 1997, there were 1,024 trace 
requests for such rifles. Treasury Department Study 33.

 5 Under the federal Sentencing Guidelines, the prison term for a 
felon who possesses a firearm, in violation of 18 U.S.C. s 922(g)(1), 
may be reduced if the weapon was "solely for lawful sporting 
purposes." U.S. Sentencing Guidelines s 2K2.1(b)(2) (2001). The 
Third Circuit held that a defendant possessing guns solely for 
plinking "at cans, bottles, and the like in trash dumps or as they 
were floating by in a river," meets this standard. United States v. 
Bossinger, 12 F.3d 28, 29 (3d Cir. 1993). The Bossinger decision 
does not interpret s 925(d)(3) and the Sentencing Guidelines do not 

 Springfield also believes its rifles are used for "sporting 
purposes" in "practical shooting" events. Practical shooting, 
according to BATF, "involves moving, identifying, and engag-
ing multiple targets and delivering a number of shots rapidly. 
In doing this, practical shooting participants test their defen-
sive skills as they encounter props, including walls and barri-
cades, with full or partial targets, 'no-shoots,' steel reaction 
targets, movers, and others to challenge them." Treasury 
Department Study 17 n.48. BATF analogized these events to 
a "police/combat-style competition" which has never been 
considered a sporting purpose. See Gilbert Equip. Co., 709 
F. Supp. at 1075-76, 1077. Springfield provided no informa-
tion about practical shooting to BATF. Its submission to the 
agency in response to the proposed revocation of its permits 
did not even mention the activity. While it may be that 
"sporting purpose" is not a static concept, see Gun South, 
Inc. v. Brady, 877 F.2d 858, 864 (11th Cir. 1989), particularly 
in view of the "generally recognized" requirement, neither 
BATF nor this court have received any information demon-
strating that a rifle must accept large magazines of ammuni-
tion if it is to be used at a practical shooting competition. 
Nor has Springfield demonstrated that its rifles, as currently 
designed, are "generally recognized" as "particularly suitable 
for or readily adaptable to" practical shooting.6

 Springfield's final point is that it was arbitrary and capri-
cious for BATF to bar importation of firearms it had in the 
past allowed to be imported. But agency views may change. 
See Greater Boston Television Corp. v. FCC, 444 F.2d 841, 
852 (D.C. Cir. 1970). We said earlier that the record contains 

__________
contain the qualifier "generally recognized" found in the provision 
before us.

 6 Springfield argues that because s 925(d)(3) bars the importation 
of "surplus military firearms" for "sporting purposes," BATF can 
grant permits for the importation of military firearms which are not 
"surplus." Brief for Appellant at 23. This is true, but not suffi-
cient to reverse the agency. Springfield's rifles must still be "of a 
type that" "is generally recognized as particularly suitable for or 
readily adaptable to sporting purposes."

no information indicating why BATF had thought that 
Springfield's two rifles satisfied s 925(d)(3). See supra note 
1. All we know is that from 1989 to 1997, when the tempo-
rary ban took effect, a rifle's ability to accept a large, 
military-style magazine did not automatically disqualify it for 
importation. BATF fully explained why it has now decided 
that this particular military feature found in Springfield's 
rifles is of considerable significance. The courts may require 
only "a reasoned analysis indicating that prior policies and 
standards are being deliberately changed, not casually ig-
nored." Id.; see also Motor Vehicles Mfrs. Ass'n v. State 
Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983); Am. 
Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry., 387 
U.S. 397, 416 (1967). The BATF Director's decision revoking 
Springfield's permits met that standard.7

 Affirmed.

__________
 7 We have considered and rejected Springfield's other arguments. 
They occasion no need for a written opinion. See D.C. Cir. R. 36(b).