25 So.3d 847 (2009)
BELLE COMPANY, LLC
v.
STATE of Louisiana, through the DEPARTMENT OF ENVIRONMENTAL QUALITY, Assumption Parish, Mike McDaniel and Chuck Carr Brown.
No. 2008 CA 2382.
Court of Appeal of Louisiana, First Circuit.
June 12, 2009.
Writ Denied October 9, 2009.
*848 Ross A. Brupbacher, Robert R. Broussard, Lafayette, LA, for Plaintiff/Appellant, Belle Company, LLC.
James P. Doré, Alan J. Berteau, Baton Rouge, LA, for Defendant/Appellee, Assumption Parish Police Jury.
Stephen J. Oats, Patrick B. McIntire, Gordon Square, Lafayette, LA, Elliott Vega, Roger K. Ward Baton, Rouge, LA, for Defendants/Appellees, State of Louisiana, through the Department of Environmental Quality, Mike McDaniel, and Chuck Carr Brown.
Before CARTER, C.J., WHIPPLE and DOWNING, JJ.
WHIPPLE, J.
This matter involves a suit by Belle Company, LLC, (Belle) against the Louisiana Department of Environmental Quality (DEQ), seeking declaratory judgment and damages for inverse condemnation pursuant to LSA-Const. art. I, sec. IV, based on the DEQ's alleged wrongful refusal to grant Belle's solid waste permit application through which Belle sought to operate a solid waste landfill on its property in Assumption Parish. The DEQ filed exceptions of lis pendens, lack of subject matter *849 jurisdiction, no cause of action, and prescription. From the trial court's judgment granting the exception of lis pendens with regard to the actions for declaratory judgment, granting the exception of no cause of action with regard to the action for damages, and alternatively granting the exception of prescription with regard to the action for damages, Belle appeals. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
In October 1994, Belle filed an application with the DEQ for a permit to construct and operate a Type I and Type II non-hazardous solid waste landfill in Assumption Parish.[1] On August 15, 1997, the DEQ granted Belle's permit application. Assumption Parish People's Environmental Action League (APPEAL) filed a petition for review with the district court, naming the DEQ as a defendant and raising various assignments of error. The district court concluded that the DEQ had satisfied its duties as the public trustee in issuing Belle's permit, but determined that the DEQ had erred in granting a permit to Belle without ensuring prior compliance with LSA-R.S. 30:2157.[2] Accordingly, by judgment dated September 14, 1998, the district court reversed the DEQ's decision to issue the permit and remanded the matter to the DEQ for further proceedings on the issue of compliance with LSA-R.S. 30:2157.
On appeal to this court by APPEAL, this court concluded that the DEQ's decision was supported by its factual findings and its articulation of a rational connection between the facts found and the permit issued. Thus, this court concluded that the DEQ had performed its duty as protector of the environment, and APPEAL'S assignments of error were found to lack merit. In re Belle Company, XXXX-XXXX (La.App. 1st Cir.6/27/01), 809 So.2d 225, 239 & 242. However, Belle filed an answer to the appeal, challenging the district court's finding regarding failure to comply with LSA-R.S. 30:2157. In response to the answer to the appeal, this court found no error in the district court's reversal of the DEQ's decision to grant the permit, for failure to require compliance with LSA-R.S. 30:2157 prior to issuance of the permit, and remanded this matter for further proceedings on the issue of compliance with the emergency response statute, LSA-R.S. 30:2157. In re Belle Company, 809 So.2d at 245.
*850 After the matter was remanded to the DEQ, Belle submitted an update to the revised emergency response plan that had been submitted to the DEQ during the pendency of the appeal, and public hearings were conducted on the revised contingency plan for hazardous materials emergencies. However, the DEQ also requested that Belle update and supplement some of the data contained in its application that was unrelated to the emergency response issue.
On June 29, 2005, a notice of deficiency was issued, which contained a request that Belle provide a wetlands determination pursuant to LAC 33:VII.521(A)(l)(e)(ii), a wetlands demonstration pursuant to LAC 33:VII.521(A)(1)(f), if applicable, and documentation that the proposed landfill did not violate existing land-use requirements pursuant to LAC 33:VII.519(N), the applicable Louisiana Administrative Code provisions at that time. Thereafter, by letter dated September 20, 2005, the DEQ informed Belle that the Water and Waste Permits Division had discontinued review of its permit application pending receipt by the DEQ of the wetlands determination, the wetlands demonstration, if applicable, and proper documentation from the local governing body that the proposed use did not violate existing land-use requirements.
In response, Belle filed a petition for writ of mandamus on September 22, 2005, contending that, in making additional requests not related to the emergency response issue, the DEQ had acted beyond the scope of the remand and had reopened the entire permit process. Belle contended that since it had fulfilled its emergency response requirements under LSA-R.S. 30:2157, it was entitled to a writ of mandamus, directing the DEQ's secretary and assistant secretary to immediately grant Belle's request for a solid waste disposal permit or show cause to the contrary.
While the district court concluded that a writ of mandamus was inappropriate because of the discretion afforded the DEQ, this court, on appeal, concluded that because the secretary of the DEQ had failed to render a final decision within the deadline set forth in LSA-R.S. 30:2022(B), Belle was entitled to the issuance of a writ of mandamus, pursuant to LSA-R.S. 30:2050.29, directing the secretary or authorized assistant secretary to act within a specified period of time. In re Belle Company, LLC, XXXX-XXXX (La.App. 1st Cir.12/28/07), 978 So.2d 977, 985, writs denied, XXXX-XXXX, XXXX-XXXX (La.3/24/08), 977 So.2d 957, 958. Moreover, this court further noted that the prior order of remand by the district court to the DEQ did not authorize reconsideration of Belle's entire permit application, but, rather, was limited to the issue of Belle's compliance with the emergency response statute. In re Belle Company, LLC, 978 So.2d at 985-986. Thus, this court reversed the district court's denial of Belle's petition for writ of mandamus and remanded the matter to the district court with instructions to issue the writ of mandamus, directing the DEQ to render a final decision on Belle's application within 30 days of the finality of the court's opinion. In re Belle Company, LLC, 978 So.2d at 986.
Meanwhile, on September 7, 2007, Belle filed the instant suit against the DEQ for declaratory relief and damages in regard to the DEQ's alleged wrongful refusal to issue the Type I and Type II sanitary landfill permit to Belle.[3] In its original *851 and amended petitions, Belle sought judgment declaring, in pertinent part, that:
(1) The judgments rendered by the district court and this court in In re Belle Company, LLC, XXXX-XXXX (La.App. 1st Cir.6/27/01), 809 So.2d 225, are law of the case between the parties;
(2) Belle has complied with LSA-R.S. 30:2157 by its emergency response submittals to the DEQ;
(3) the DEQ and its secretary are bound by the constraints of LSA-R.S. 30:2022 and LAC 33:I.1505 and have no discretion with regard to the application of same;
(4) Belle's compliance with the mandates of the district court and the appellate court entitles it ipso facto, without any additional consideration, to a Type I and Type II sanitary landfill permit, effective May 27, 2002;
(5) the DEQ, by its inaction with regard to the mandatory time constraints set forth in LSA-R.S. 30:2022 and the applicable Louisiana Administrative Code provisions, illegally expanded the scope of its review of Belle's permit application;
(6) the DEQ illegally expanded the scope of its review of Belle's permit application by adding additional conditions as referenced in the DEQ's September 20, 2005 letter;
(7) the wetlands determination requirement set forth in the DEQ's September 20, 2005 letter is inapplicable to Belle's permit application;
(8) the wetlands demonstration requirement set forth in the DEQ's September 20, 2005 letter is inapplicable to Belle's permit application; and
(9) the requirement of providing documentation that the proposed use does not violate existing land use requirements is inapplicable to Belle's permit application.
In addition to its request for declaratory judgment, Belle also contended that the DEQ's actions in failing to issue Belle's permit by May 27, 2002, illegally expanding the scope of its review of the permit application upon remand, and adding additional requirements or conditions to Belle's permit application upon remand violated Belle's constitutional right to control, use, and enjoy its land, as guaranteed by LSA-Const. art. I, sec. IV. Thus, Belle contended that the DEQ's actions were tantamount to an inverse condemnation of Belle's property, without due process or just compensation. Accordingly, Belle sought judgment against the DEQ, awarding Belle damages for inverse condemnation.
The DEQ responded to the petitions by filing exceptions raising the objections of lis pendens, lack of subject matter jurisdiction, no cause of action, and prescription. With regard to the exception of lis pendens, the DEQ averred that the gist of Belle's lawsuit herein was that the DEQ had damaged Belle by not issuing to Belle the requested landfill permit. The DEQ contended that the allegations and claims in the instant suit were virtually identical to the allegations set forth in the mandamus proceedings, which, at that time, were pending on appeal.[4] Thus, the DEQ *852 sought dismissal without prejudice of the instant suit.
With regard to the exception of lack of subject matter jurisdiction, the DEQ contended that, by means of this declaratory judgment action, Belle was requesting that the district court, in effect, issue the landfill permit, an action over which the district court did not have subject matter jurisdiction. In support of its exception of no cause of action, the DEQ asserted that, under these circumstances, the law did not provide Belle with a cause of action for damages. Alternatively, the DEQ contended that any claim for damages was prescribed on the face of the petition.
Following a hearing on the exceptions, the district court rendered judgment: maintaining the exception of lis pendens with regard to the actions for declaratory judgment, thereby dismissing those actions; maintaining the exception of no cause of action with regard to the action for damages (i.e., the inverse condemnation claim), thereby dismissing that action; and, alternatively, maintaining the exception of prescription with regard to the damages claim.[5] Thus, Belle's claims against the DEQ were dismissed in their entirety.
From this judgment, Belle appeals, contending that: (1) the district court committed legal error in maintaining the DEQ's exception of no cause of action regarding Belle's inverse condemnation action against the DEQ, despite the fact that LSA-Const. art. I, sec. 4 and the interpreting jurisprudence require that Belle be compensated to the full extent of its loss as a result of the DEQ's actions (and delays) which constituted a taking of Belle's property; and (2) the district court committed legal error in maintaining the DEQ's exception of prescription regarding Belle's inverse condemnation action against the DEQ, despite the fact that the DEQ's taking of Belle's property did not occur, at the earliest, until September 20, 2005, and despite the fact that the applicable prescriptive period is three years from the date of discovery of the taking.[6]

DISCUSSION
The function of the peremptory exception of no cause of action is to test the legal sufficiency of the petition by determining whether the law affords a remedy on the facts alleged in the pleading. Ourso v. Wal-Mart Stores, Inc., XXXX-XXXX (La.App. 1st Cir.11/14/08), 998 So.2d 295, 298, writ denied, 2008-2885 (La.2/6/09), 999 So.2d 785. A cause of action, for purposes of the peremptory exception, is defined as the operative facts that give rise to the plaintiffs right to judicially assert the action against the defendant. Bayou Liberty Association, Inc. v. St. Tammany *853 Parish Council, XXXX-XXXX (La.App. 1st Cir.6/9/06), 938 So.2d 724, 728.
Generally, no evidence may be introduced to support or controvert the exception raising the objection of no cause of action. LSA-C.C.P. art. 931; Bayou Liberty Association, Inc., 938 So.2d at 728. In addition, all facts pled in the petition must be accepted as true. Thus, the only issue at the trial of the exception is whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. Ourso, 998 So.2d at 298. Because the exception raises a question of law, appellate courts review a judgment maintaining a peremptory exception raising the objection of no cause of action de novo. Bayou Liberty Association, Inc., 938 So.2d at 728.
Article I, section 4(B) of the Louisiana Constitution provides authority for the bringing of an inverse condemnation claim: "Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into the court for his benefit."[7]Suire v. Lafayette City-Parish Consolidated Government, XXXX-XXXX (La.4/12/05), 907 So.2d 37, 60. One aim of article I, sec. 4 was to assure that the State and its subdivisions compensate owners for any taking or damaging of their rights with respect to things as well as for any taking or damaging of the objects of those rights. State, Department of Transportation and Development v. Chambers Investment Company, Inc., 595 So.2d 598, 602 (La.1992).
Moreover, our constitution requires compensation even though the State or its subdivision has not initiated expropriation proceedings in accordance with the statutory scheme set up for that purpose. Although the legislature has not provided a procedure whereby an owner can seek damages for an uncompensated taking or damaging, an action for inverse condemnation arises out of the self-executing nature of the constitutional command to pay just compensation. Chambers Investment Company, Inc., 595 So.2d at 602. The action for inverse condemnation provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced. Chambers Investment Company, Inc., 595 So.2d at 602.
To establish inverse condemnation, a party must show that: (1) a recognized species of property right has been affected; (2) the property has been taken or damaged in a constitutional sense; and (3) the taking or damaging was for a public purpose under LSA-Const. art. I, sec. 4. Suire, 907 So.2d at 60.
In the instant case, Belle alleged in its amended petition that its "rights to the landfill [p]ermit" and its "rights `to ... control, use, enjoy, and protect ...' its land" were adversely affected by the DEQ's actions in "not issuing Belle's [p]ermit by May 27, 2002," "illegally expanding the scope of its review of the [p]ermit [application," and "adding conditions to Belle's [p]ermit," actions which Belle contended were "tantamount to an inverse condemnation of Belle's property." Accordingly, in determining whether Belle has stated a cause of action for inverse condemnation, we must address whether these rights that Belle contends were affected constitute property or a recognized species of property right within the purview of an inverse condemnation claim and, if they do constitute recognized property *854 rights, whether these rights have been taken or damaged in a constitutional sense. Suire, 907 So.2d at 60; Chambers Investment Company, Inc., 595 So.2d at 603.
In support of its contention that the rights asserted do not constitute a recognized species of property right that would support an inverse condemnation claim, the DEQ contends that the right to use and own private property "is subject to reasonable statutory restrictions and the reasonable exercise of the police power," LSA-Const. art. I, § 4, and that the State has lawfully exercised its police power in the environmental arena. The DEQ argues that takings cases do not expand the notion of "property" to allow the permit itself to be considered the property which has been taken; thus, it argues, Belle's "property" at issue is the real estate, not Belle's expectation of a permit from the DEQ. The DEQ further points out that, because of the public health and safety issues involved, no property owner has a constitutionally protected right to build a landfill on his property, unless a permit is granted by the DEQ. See LSA-R.S. 30:2155. Quoting Mitchell Arms, Inc. v. United States, 7 F.3d 212, 217 (Fed.Cir. 1993), cert. denied, 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994) the DEQ contends that "as against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public."
On the other hand, Belle argues that its "right to use its property for lawful purposes" is a recognized species of right that has been affected.[8] Citing Annison v. Hoover, 517 So.2d 420 (La.App. 1st Cir. 1987), writ denied, 519 So.2d 148 (La. 1988), and Rivet v. State of Louisiana, Department of Transportation and Development, 93-369 (La.App. 5th Cir.3/16/94), 635 So.2d 295, 298, writ denied, 94-1606 (La.11/29/94), 646 So.2d 397, Belle further asserts that a governmental taking may occur in the form of zoning or rezoning or in the form of the denial of a requested permit.
In Rivet, the permit at issue was not a solid waste disposal permit, but, rather, was a driveway permit, and the property right affected was access to a state highway. Rivet, 635 So.2d at 298. Thus, because the denial of ingress and egress to the state highway substantially impaired the landowner's ability to use and develop his property, the court concluded that the landowner had established a taking. Rivet, 635 So.2d at 298.
This court, in Annison, addressed the distinction between "physical takings" and "regulatory takings" and concluded that regulatory programs that affect property values may or may not constitute takings. Annison, 517 So.2d at 423. In Annison, the plaintiffs were receiving lot rental payments for three mobile homes located on their property when the Board of Aldermen for the city of Denham Springs adopted ordinances annexing the property *855 into the city of Denham Springs, zoning the property "R-I" residential, and restricting the use of mobile homes within the city limits. Annison, 517 So.2d at 421.
On review of the district court's rejection of the plaintiffs' claims against city officials, this court noted that the United States Supreme Court in First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), held that a governmental taking may occur in the form of zoning or rezoning. Annison, 517 So.2d at 422-423. This court then held that a regulatory program, such as the zoning ordinances at issue therein, that adversely affects property values does not constitute a taking unless it destroys a major portion of the property's value. Annison, 517 So.2d at 423.
Thus, in Annison, this court recognized the possibility that a plaintiff may state a cause of action for inverse condemnation as the result of a "regulatory taking" in certain limited circumstances. However, we conclude that the facts alleged herein, which we must take as true for purposes of consideration of this exception, are readily distinguishable and simply cannot support a claim for inverse condemnation.
Ownership is the right that confers on a person direct, immediate, and exclusive authority over a thing. The owner of a thing may use, enjoy, and dispose of it within the limits and under conditions established by law. LSA-Const. art. I, § 4; LSA-C.C. art. 477; Chambers Investment Company, Inc., 595 So.2d at 603. However, the rights of a land owner are always "subject to reasonable statutory restrictions and the reasonable exercise of the police power." LSA-Const. art. I, § 4.
Article IX, section 1 of the Louisiana Constitution provides:
The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy.
As part of the State's exercise of its police power, the DEQ was created and given jurisdiction over matters affecting the regulation of the environment within the state, including the regulation of solid waste disposal. LSA-R.S. 30:2011. The legislature gave the DEQ the primary responsibility for protecting the environment, and the DEQ has specifically been given the directive "to control and regulate pollution of the environment caused by solid waste disposal practices." LSA-R.S. 30:2154(A)(3); In re American Waste and Pollution Control Company, 93-3163 (La.9/15/94), 642 So.2d 1258, 1262. To carry out this duty, the DEQ has been empowered to grant or deny environmental permits. In re American Waste and Pollution Control Company, 642 So.2d at 1262. As such, a land owner does not have a recognized right to build and operate a landfill on his property without prior approval by the DEQ. See LSA-R.S. 30:2155.
In Allied-General Nuclear Services v. United States, 839 F.2d 1572 (Fed.Cir.), cert denied, 488 U.S. 819, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988), the United States Court of Appeals addressed the issue of whether the Nuclear Regulatory Commission's refusal to recommence consideration of a corporation's application for a permit to operate a plutonium reprocessing plant constituted the "taking" of a property right for which compensation was due.[9] *856 In concluding that the corporation had no legally protected property right to operate the plutonium reprocessing plant, the court relied upon the basic premise that, as against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public. Allied-General Nuclear Services, 839 F.2d at 1576.
Similarly, when faced with the question of whether the suspension and revocation of permits for the importation of assault rifles by the Bureau of Alcohol, Tobacco, and Firearms (ATF) constituted a compensable taking under the Fifth Amendment, the federal appellate court concluded that the firearm importer's expectation of selling assault rifles in the United States was not a property right protected by the Fifth Amendment. Mitchell Arms, Inc. v. United States, 7 F.3d at 217. The court held that enforceable rights sufficient to support a taking claim against the government cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive government control. Mitchell Arms, Inc., 7 F.3d at 216. The court noted that the firearms importer voluntarily entered the firearms import business, thereby knowingly placing itself in the governmentally controlled arena of firearms importation. Thus, the court concluded that the firearms importer's expectation of selling assault rifles in the United States, which expectation flowed from the ATF permits, could not be said to be a property right protected under the Fifth Amendment. Mitchell Arms, Inc., 7 F.3d at 216.
Additionally, the court noted that the interest affected by the ATF's actions  the right to sell assault weapons in domestic commerce  is not a right inherent in the firearm importer's ownership of those weapons. Rather, that right comes into being only upon the issuance of an import permit. Consequently, because the firearms importer's ability to import the rifles and sell them in the United States was at all times entirely subject to the ATF's regulatory power, any expectation arising from the import permits did not constitute a property right protected by the Fifth Amendment.[10]Mitchell Arms, Inc., 7 F.3d at 217.
Likewise, in seeking a permit from the DEQ to operate a solid waste landfill on its property, Belle voluntarily sought to enter into an arena subject to pervasive government control. As such, the interest affected by the DEQ's actions  the right to operate a solid waste landfill  is not a right inherent in Belle's ownership of immovable property in this state. Rather, *857 such a right would come into being only upon the issuance of the permit by the DEQ. Consequently, we conclude that, because Belle's ability to operate a solid waste landfill was at all times entirely subject to the DEQ's regulatory power, any expectation arising from Belle's submission of a solid waste disposal permit application did not constitute a property right protected by art. I, sec. 4 of the Louisiana Constitution. See Mitchell Arms, Inc., 7 F.3d at 217.
While Belle does have a right to timely consideration by the DEQ of its permit application, see LSA-R.S. 30:2022(B)(2), given the heavily regulated nature of solid waste disposal practices and given the public health and safety issues concerned, we find that such a right is not a property right within the context of an inverse condemnation claim. Moreover, a remedy for a violation of that right is provided in LSA-R.S. 30:2050.29, which authorizes the applicant to seek a writ of mandamus requiring timely consideration of the application. Indeed, Belle sought, and received, just that relief in the mandamus proceeding it filed on September 22, 2005. See In re Belle Company, Inc., 978 So.2d at 985.
Accordingly, considering the foregoing, we find no error in the portion of the district court's judgment maintaining the DEQ's exception of no cause of action and dismissing Belle's claims for inverse condemnation against it.[11] Having found *858 that the maintaining of the exception of no cause of action was legally correct, we pretermit consideration of the trial court's alternate ruling maintaining the exception of prescription.

CONCLUSION
For the above and foregoing reasons, the June 27, 2008 judgment of the district court dismissing Belle's claims against the DEQ is affirmed. Costs of this appeal are assessed against Belle Company, Inc.
AFFIRMED.
DOWNING, J., dissents.
CARTER, C.J., Concurs.
NOTES
[1] Belle's permit application has had a protracted procedural history and has been the subject of two reported decisions of this court. See In re Belle Company, LLC, XXXX-XXXX (La.App. 1st Cir. 12/28/07), 978 So.2d 977, writs denied, XXXX-XXXX, XXXX-XXXX (La.3/24/08), 977 So.2d 957, 958, and In re Belle Company, LLC, XXXX-XXXX (La.App. 1st Cir.6/27/01), 809 So.2d 225. The background facts and procedural history stated herein are taken in large part from these prior reported decisions.
[2] While Belle's permit application was pending before the DEQ, the legislature enacted LSA-R.S. 30:2157, effective June 20, 1997, pertaining to emergency response standards. The statute provides that prior to the issuance of a permit, the applicant for a solid waste disposal facility shall review and consider the ability of the local emergency response agencies and medical care facility to respond to a hazardous material incident at the facility. The applicant is further required to obtain certification from the local fire department, local emergency medical services agency, and the local hospital as to their ability to respond to such an emergency. LSA-R.S. 30:2157(A) & (B).

Although the effective date of the statute predated the DEQ's permit decision in this case, the DEQ made no reference to these specific requirements in its decision, noting instead that Belle had promised to secure the appropriate emergency response certifications before becoming operational.
[3] In its original petition, Belle also named as defendants: Assumption Parish; Mike McDaniel, in his official capacity as Secretary of DEQ; and Chuck Carr Brown, in his official capacity as Assistant Secretary of DEQ. However, in its first amended petition, Belle amended the original petition to list the named defendants as only DEQ and Assumption Parish. Belle's claims against Assumption Parish involved certain ordinances passed by the Assumption Parish Police Jury, which Belle contended interfered with its ability and right to use its property as a solid waste landfill. These claims are the subject of the related appeal of Belle Company, LLC v. State of Louisiana, through the Department of Environmental Quality, 2008 CA 2381, 11 So.3d 1242, also handed down this date.
[4] In its memorandum in support of the exception of lis pendens, the DEQ noted that at the time of filing the exception, this court had rendered its decision in the mandamus case, but writ applications were pending before the Louisiana Supreme Court.
[5] The judgment's silence as to the exception of lack of subject matter jurisdiction is deemed a denial or rejection of that exception. See Wood v. Brian Harris Autoplex, XXXX-XXXX (La.App. 1st Cir.8/3/05), 923 So.2d 17, 21 n. 3.
[6] Belle has not challenged the district court's maintaining of the exception of lis pendens and resulting dismissal of its declaratory judgment claims herein. Accordingly, the portion of the district court's judgment dismissing Belle's claims for declaratory judgment is not before us.

We further note that in an additional assignment of error, Belle challenges the district court's June 12, 2008 judgment, maintaining the exception of res judicata filed by the Assumption Parish Police Jury. However, that judgment is the subject of the related appeal of Belle Company, LLC v. State of Louisiana, through the Department of Environmental Quality, 2008 CA 2381, and that additional assignment of error is addressed therein.
[7] Subsection (B) of article I, section 4 of the Louisiana Constitution was amended by Acts 2006, No. 851. However, the above-quoted provision remained unchanged.
[8] Belle concedes in brief to this court that the DEQ in fact issued the requested permit to Belle in June 2008. However, Belle contends that the DEQ's issuance of the permit does not affect its right to inverse condemnation damages for the DEQ's unilateral and summary act of discontinuing its review of Belle's permit application in September 2005, given that the DEQ's discontinuing of review of Belle's application caused Belle a "temporary loss of use of its property." Belle notes that the United States Supreme Court in First English Evangelical Lutheran Church of Glendale v. County of Los Angeles. California, 482 U.S. 304, 318, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987), held that a "temporary" regulatory taking may require the payment of just compensation pursuant to a claim of inverse condemnation.
[9] We note that Allied-General Nuclear Services involved a taking claim brought pursuant to the Fifth Amendment of the United States Constitution. While Belle, in its petitions, relied primarily upon Louisiana Constitution art. I, sec. 4 in asserting its inverse condemnation claim, it also contended that the DEQ had violated its Louisiana and United States constitutional rights. The language of both the Fifth Amendment of the United States Constitution and of art. I, sec. 4 of the Louisiana Constitution provides that private property shall not be taken for public use without just compensation, Annison, 517 So.2d at 423, and we find the federal cases we discuss herein to be instructive.
[10] The court further noted that in revoking the permits, the ATF withdrew its prior authorization for the firearms importer to sell the assault rifles in the United States, but that, otherwise, the firearms importer retained complete control over the rifles and could have done anything it wished with the rifles except import them into the United States. Mitchell Arms, Inc., 7 F.3d at 217. Similarly, while the DEQ's refusal to continue consideration of Belle's permit application prevented Belle from gaining the necessary permission to operate a solid waste landfill on its property, Belle nonetheless retained complete control over its property and could use the property for any lawful purpose.
[11] In so holding we recognize there is no blanket rule that one may never prevail on a takings claim if participating in a heavily regulated industry, Maritrans, Inc. v. United States, 40 Fed.Cl. 790, 795-797 (1998), but that the asserted claim may be considered in the context of reasonableness of the property owner's expectation and the safety issue underlying the regulation. See for example NRG Company v. United States, 24 Cl.Ct. 51, 52-53 (1991), in which the owners of mineral prospecting permits that authorized them to explore for coal on an Indian reservation brought actions claiming that the government's cancellation of the permits pursuant to the Cancellation Act constituted a taking under the Fifth Amendment. On cross-motions for summary judgment, the court held that the cancellation of the permits constituted a taking of plaintiffs' property.

The court found that the appropriate standard for evaluating a taking claim was set forth in Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), where the Court listed three factors of particular significance to the inquiry: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct "investment-backed expectations"; and (3) the character of the government action. Evaluating these factors, the court determined that a federal taking of private property had occurred therein. Regarding the first factor, the court found that plaintiffs had invested substantial sums and had suffered significant economic hardship. Regarding the second factor, the court determined that the government had modified established rules after pertinent agreements had been entered into, which was not reasonably foreseeable. However, as noted therein (and unlike the instant case), regarding the character of the governmental action, the court noted that there were no issues of safety involved. NRG Company, 24 Cl.Ct. at 60-63.
See also United Nuclear Corporation v. United States, 912 F.2d 1432, 1433 (Fed.Cir. 1990), in which a mining company alleged that the failure of the Department of the Interior to approve its mining plan was a taking without just compensation. The company had been awarded uranium leases on reservation land by the Navajo Tribal Council, but the Council later objected to the mining plan. The Secretary of the Interior refused to approve the mining plan without tribal approval, approval which had never before been required.
In finding that a taking had occurred, the court looked to the Connolly factors listed above. The court also distinguished Allied-General Nuclear Services, Inc. v. United States, (the nuclear fuel reprocessing permit case), noting that Allied-General involved issues of national safety, and, thus, the court had found no legally protected property right. However, because the Secretary's actions did not involve national safety, and the property interest taken was the plaintiff's leasehold interest in the minerals, not a mere expectation that plaintiff would be permitted to engage in mining, the court found that a "taking" had occurred. United Nuclear Corporation, 912 F.2d at 1437-1438.
See further Acceptance Insurance Companies, Inc. v. United States, 84 Fed.Cl. Ill (2008), where an insurance holding company brought suit against the U.S., alleging that a regulatory taking had occurred when the government had blocked the proposed sale of certain crop insurance policies to a private third party purchaser. The federal appellate court found that the plaintiff did not have a cognizable property interest in selling its property to a third party purchaser under the terms of a proposed, non-binding agreement. Acceptance Insurance Companies, Inc., 84 Fed.Cl. at 116. See also American Pelagic Fishing Company v. United States, 379 F.3d 1363, 1366-1368 (Fed.Cir.2004), where the owner of the vessel which had been transformed for use as a commercial fishing vessel brought suit alleging that the revocation of permits allowing it to conduct fishing operations for mackerel and herring in the Exclusive Economic Zone (EEZ) of the United States in the Atlantic Ocean constituted a taking. The federal appellate court concluded that the owner did not have a protected property interest in the permits and authorizations or in the right to use its vessel to conduct fishing operations. American Pelagic Fishing Company, 379 F.3d at 1366-1367, 1374.
In finding no protected property interest, the federal appellate court held that plaintiff did not and could not have a property interest in the fishery permits and that plaintiff likewise did not have a property interest in the use of its vessel to fish in the EEZ. Citing Mitchell Arms, Inc. v. United States, 7 F.3d 212 (Fed.Cir.1993), (the denial of the permit to import weapons case), the court noted that the right to use the vessel to fish in the EEZ was not inherent in the ownership of the vessel. American Pelagic Fishing Company, 379 F.3d at 1381-1383.